242 F.2d 932
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
LOCAL 11, UNITED BROTHERHOOD OF CARPENTERS & JOINERS OF AMERICA, AFL, and Cuyahoga, Lake & Geauga & Ashtabula Counties Carpenters' District Council, Affiliated with United Brotherhood of Carpenters & Joiners of America, AFL, and Frank Ailor, Business Agent, Respondents.
 No. 12798.
 United States Court of Appeals Sixth Circuit.
 April 10, 1957.
 
 Norton J. Come, Washington, D. C. (Theophil C. Kammholz, Gen. Counsel, David P. Findling, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Franklin C. Milliken, Attys., Washington, D. C., on the brief), for petitioner.
 Jerome N. Curtis, Cleveland, Ohio (Roger A. Zucker, Cleveland, Ohio, on the brief), for respondents.
 Before SIMONS, Chief Judge, and McALLISTER and STEWART, Circuit Judges.
 STEWART, Circuit Judge.
 
 
 1
 The National Labor Relations Board seeks enforcement of its order holding that respondents were guilty of an unfair labor practice in participating in a secondary boycott prohibited by the National Labor Relations Act, as amended by the Labor Management Relations Act of 1947, 29 U.S.C.A. § 141 et seq.
 
 
 2
 Section 8(b) (4) (A) of the Act makes it an unfair labor practice for a labor organization or its agents: "to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use * * * or otherwise handle or work on any goods, * * * [or] materials, * * * where an object therof is: (A) forcing or requiring * * * any employer or other person to cease using * * * the products of any other * * * manufacturer, or to cease doing business with any other person * * *." 29 U.S. C.A. § 158(b) (4) (A).
 
 
 3
 The Board contends that respondents induced a concerted refusal on the part of employees of subcontractors to use or handle, in the course of their employment, certain "pre-hung" doors in houses in a building project in Ohio, with an object prohibited by the statute. The doors had been manufactured in Indiana and Michigan by corporations located in those states, and had been sold to Scholz Homes, Inc., in Toledo, Ohio. Scholz had resold the doors as component parts of prefabricated home units to Erie Building Company, a general contractor in the Cleveland, Ohio, area. Erie was in the process of erecting the prefabricated houses at the time of the incidents in issue, and had engaged two subcontractors to perform work which included the installation of the doors.
 
 
 4
 Substantially adopting the Trial Examiner's Intermediate Report, a majority of the Board found the respondents had induced and encouraged employees of the subcontractors to engage in a concerted refusal to handle the prehung doors, and that objectives of the respondents' conduct were to force or require the subcontractors to cease using prehung doors, to force or require Erie Building Company to cease using and purchasing prehung doors, and to force or require Scholz Homes, Inc., to cease doing business with the manufacturers of the doors. 113 N. L. R. B. 1084, 1086 (1955).
 
 
 5
 The respondents contend at the outset that the Board improperly asserted jurisdiction in this case. There is no merit in this position. The manufacturers of the doors against which the respondents' activity was directed each shipped more than $100,000 of goods in interstate commerce annually. The interference complained of had more than a de minimis effect. N. L. R. B. v. Denver Building & Const. Trades Council, 1951, 341 U.S. 675, 683-685, 71 S.Ct. 943, 95 L.Ed. 1284. Moreover, the assumption of jurisdiction was consistent with the Board's previously formulated standards and was in no way discriminatory. Jamestown Builders Exchange, 93 N. L.R.B. 386, 387 (1951).
 
 
 6
 On the merits the respondents deny that they were guilty of an unfair labor practice prohibited by the Act, for several reasons. They point out that the evidence does not show that there was any labor dispute between them and the primary employers, the manufacturers of the doors. They also contend there was no substantial evidence of their inducement or encouragement of the employees of the subcontractors to engage in a concerted refusal to work, but only of inducement of the employers themselves to cease using the doors in question. It is their further contention that, even if there was inducement and encouragement of employees, there was no proof that more than one employee of any single employer was directly contacted. Finally, they argue that there was no "concerted refusal" by the employees "in the course of their employment" to use or handle the doors, for the reason that the immediate employers, the subcontractors, had agreed in advance to their employees' actions and completely acquiesced in them. All but the last of these contentions can be disposed of briefly.
 
 
 7
 The fact that there was not an active labor dispute between the respondents and the producers of the doors would not serve to immunize the respondents from the terms of § 8(b) (4) (A) of the Act, which neither literally nor implicitly requires the existence of such a dispute as a condition of its operation. N. R. L. B. v. Washington-Oregon Shingle Weavers' Dist. Council, 9 Cir., 1954, 211 F.2d 149, 152-153.
 
 
 8
 Without question the respondents are correct in their assertion that there is nothing in § 8(b) (4) (A) of the Act which makes it an unfair labor practice for a union to appeal directly to an employer to induce him to cease doing business with another employer. Rabouin v. N. L. R. B., 2 Cir., 1952, 195 F.2d 906, 912; see Schatte v. International Alliance, 9 Cir., 1950, 182 F.2d 158, 165. In the present case, however, the Board found that the respondents had induced and encouraged employees not to handle or work on the doors in question and an examination of the record discloses that the findings of the Board that respondents had engaged in such conduct are supported by substantial evidence.
 
 
 9
 The fact that only a single employee of each subcontractor was contacted in the first instance would not of itself prevent the inducement from violating § 8(b) (4) (A) of the statute. Amalgamated Meat Cutters v. N. L. R. B., 1956, 99 U.S.App.D.C. 24, 237 F.2d 20, 23-24. As the Board pointed out, the single employees who were directly contacted by the respondents were union stewards, who could reasonably have been expected to transmit union instructions to their fellow employees.
 
 
 10
 This brings us to the respondents' primary defense. They say that even if they encouraged and induced a concerted work stoppage by employees with respect to the doors, this did not constitute an unfair labor practice within the meaning of § 8(b) (4) (A) because the immediate employers (the subcontractors) had acquiesced in advance in the employees' action by virtue of a collective bargaining agreement containing a "hot cargo" clause, and also by reason of the fact that the subcontractors themslves belonged to the union, and as union members were obligated not to use the prehung doors. Although the Board found upon conflicting evidence that no collective bargaining agreement containing a "hot cargo" clause was then in effect, it is conceded that the subcontractors were members of the union and that they acquiesced in the conduct of their employees in not handling or working on the doors in question.
 
 
 11
 The respondents' position is that if an employer has agreed in advance that a certain product need not be used by his employees, and subsequently honors his agreement by acquiescing in the employees' unwillingness to use or work on the product there can be no "concerted refusal" by the employees "in the course of their employment" to use or work on the product in question. There can be no "refusal," the argument runs, where there is no insubordination. Similarly, their conduct in not using the product cannot be "in the course of their employment," it is argued, because the employer has agreed in advance that their employment would not include working on that product. Finally, the respondents say, an employer cannot be "forced or required" to cease handling goods which he has already agreed not to handle. These semantic contentions are buttressed by the argument that the primary purpose of § 8(b) (4) (A) of the Act is to protect neutral employers from strikes resulting from their desire to use goods produced by another employer engaged in a labor dispute, and that an employer who has agreed in advance not to use such goods needs no such protection.
 
 
 12
 These arguments are not without persuasive force, and the view they represent was the one originally adopted by a majority of the Board. Rabouin, d. b.a. Conway's Express, 87 N.L.R.B. 972, affirmed sub nom. Rabouin v. N. L. R. B., 2 Cir., 1952, 195 F.2d 906; Pittsburgh Plate Glass, 105 N.L.R.B. 740, 743-45 (1953). The Board has altered its view however, and now holds that regardless of acquiescence by the immediate employer any inducement of his employees for the purposes proscribed by § 8(b) (4) (A) is an unfair labor practice, although two members of the Board still strongly adhere to the earlier view. Sand Door & Plywood Co., 113 N.L.R.B. 1210 (1955); General Drivers, 115 N.L.R.B. 800 (1956); see McAllister Transfer, Inc., 110 N.L.R.B. 1769 (1954). The Sand Door case has recently been approved by the Court of Appeals for the Ninth Circuit. N. L. R. B. v. Local 1976, United Brotherhood of Carpenters and Joiners of America, AFL, 241 F.2d 147.
 
 
 13
 The reasoning in support of the Board's present position is fully set forth in the three cited decisions and in the opinion of the Court of Appeals for the Ninth Circuit in the Sand Door case. As is there shown, the primary purpose of Congress in enacting § 8(b) (4) (A) was to protect the public interest from strikes or concerted refusals interrupting the flow of commerce at points removed from primary labor-management disputes. To allow the acquiescence of a single employer to validate conduct contrary to the express language of the statute would be to frustrate this Congressional purpose. And, as pointed out by the Board, the phrase "* * * in the course of employment" does not have the restricted meaning originally assigned to it, but rather, Congress "used this phrase only to distinguish between employees in their capacity as employees and employees in their capacity as consumers." Sand Door & Plywood Co., 113 N.L.R.B. 1210, 1217 (1955).
 
 
 14
 In the present case the Board found upon substantial evidence that there was at the time of the incidents in question no collective bargaining agreement containing a "hot cargo" clause between the subcontractors and their employees. The difficult question encountered in determining the allowable operation of such a clause in a § 8(b) (4) (A) proceeding is therefore not before us.[1] In this connection, however, the words of a former chairman of the Board are worth noting: "Perhaps more than any other, this is a field in which we should tread with cautious feet in our attempt to mark the boundaries between conduct which is permissible and that which is interdicted. I have no doubt that the courts would agree that the impact of `hot cargo' and related contract provisions upon the application of Section 8(b) (4) in varying factual situations cannot be resolved by a priori recourse to a sweeping generalization drawn from a single court decision applying the law to a particular set of facts." McAllister Transfer, Inc., 110 N.L.R.B. 1769, 1789 (1954).
 
 
 15
 Confining our decision to the facts of the case before us we hold that the Board was correct in finding that a violation of the act was not precluded by the fact that the subcontractors as union members were obligated to observe union working rules. All the elements of a § 8(b) (4) (A) violation having been found upon substantial evidence — inducement, refusal and unlawful objective — the acquiescence of the subcontractors could not serve to immunize respondent's conduct from the operation of the statute, enacted for the protection of the public as well as for the protection of neutral employers in the position occupied by Scholz and Erie, who in no way consented in advance not to use the doors in question.
 
 
 16
 For these reasons the petition for enforcement is granted.
 
 
 
 Notes:
 
 
 [1]
 The majority members of the Board are divided upon this question. One member is of the view that such clauses are "contrary to public policy." 113 N.L.R.B. 1219. "`No amount of ingenuity,'" he thinks, "`can change the simple fact that a "hot cargo" contract is nothing more than a device to immunize in advance the very conduct which Congress in response to a dire public need sought effectively to eliminate. To permit a form of legal sophistry to make possible so flagrant a subterfuge for continuing this well-known abuse in labor disputes is to make a mockery of one of the most significant provisions which Congress wrote into the Act.'" 113 N.L.R.B. 1219. The two other members of the majority, however, do not go so far. "Insofar as such contracts govern the relations of the parties thereto with each other, we do not regard it our province to declare them contrary to public policy." See 70 Har.L.R. 735 (1957); 64 Yale L.J. 1201 (1955)