NATIONAL MARITIME UNION OF
AMERICA, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

Nos. 234, 235, Dockets 29067, 29068.

United States Court of Appeals
Second Circuit.

Argued Jan. 15, 1965.

Decided·March 5, 1965.

Abraham E. Freedman, New York City (Charles Sovel, New York City, and Mandell & Wright, Houston, Tex., on the brief), for petitioner.

Stephen B. Goldberg, N. L. R. B. (Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Lawrence M. Joseph, Attorney, N. L. R. B., on the brief), for respondent.

Before SMITH, KAUFMAN and ANDERSON, Circuit Judges.

ANDERSON, Circuit Judge.

On June 10, 1963 the S. S. Maximus, owned by Cambridge Carriers, Inc., docked at Pier 84 South in Philadelphia. The vessel had been commissioned to take food and drugs to Cuba in exchange for prisoners. Although the Grace Line, from which Cambridge had acquired the vessel a short time before, had a contract with Marine Engineers Beneficial Association (hereinafter referred to as MEBA), an affiliate of Seafarers International Union (referred to as SIU), Cambridge had collective bargaining agreements with National Maritime Union (referred to as NMU) and employed, as engineers, members of NMU's affiliate, Brotherhood of Marine Officers (referred to as BMO).

Shortly after the S. S. Maximus docked, MEBA picketed at Pier 84 and displayed placards describing Cambridge as unfair to MEBA engineers. At the same time a stevedoring company failed to order the necessary gangs, thus preventing the loading of the vessel's cargo and immobilizing her crew.

In retaliation NMU established picket lines at various piers in the ports of Philadelphia, Houston and Galveston where there were docked ships which had MEBA members in their crews. The placards of the picketers bore the legend "Informational Picketing" and said, "MEBA Engineers Interferes With Lawfully Recognized N. M. U." In Philadelphia the NMU picketing commenced on June 14 at Pier 27 on the north side of which the Weyerhaeuser vessel George S. Long, manned by MEBA engineers, was moored. On June 19, the picketing was extended to cover the vessel Portmar, owned by Calmar Steamship Corporation, also manned by MEBA engineers, which was moored on the south side of Pier 27. Nacirema Operating Co., a corporation performing stevedoring services in Philadelphia for Calmar and Weyerhaeuser, and Hinkins Steamship Agency, Weyerhaeuser's agent for soliciting and receiving cargo, were unable to perform their duties because of the refusal of the longshoremen to cross the picket line

which was on a public street across the entrances to the north and south sides of the pier. Hinkins asked that the picket lines be removed, but was told by one Jardine, the picket captain, and one Parisi, NMU's port agent, that the request was impossible. Previously, just before pickets were placed to cover the south side of the pier, Jardine had been asked by a clerk for Weyerhaeuser's cargo agent whether or not there was any objection to the company's receiving freight on the south side of the pier and Jardine said that there was. Pickets were thereupon placed there, and unloading operations ceased. Similarly, Calmar was unable to have its vessel Portmar discharged of cargo. When Calmar's agent asked Jardine to move the picket line so that the work could go forward, Jardine refused.

In Houston and Galveston similar work stoppages occurred as employees of the stevedoring companies refused to perform services. At Houston there were eight ships at the Navigation District wharves and eight ships at Long Reach docks. As a result of the picketing and while it lasted, no ships handled cargo and no work of any kind was done at the docks. NMU's port agent at Houston, one McDowell, knew that the work stoppages resulted from picketing at that port; he so reported to NMU's headquarters in New York, and when, on June 20, 1963, the picketing ended in Philadelphia and he was so advised, McDowell said to reporters in Houston, "I have just called off my pickets, and as far as I am concerned the port can get back into operation."

At Galveston unloading of Delta Steamship Lines' vessel Del Alba at Pier 35 was discontinued on June 17, 1963 as soon as NMU commenced picketing the pier and the work stoppage continued during the two days the pier was picketed. The NMU had no dispute with any of the shipowners, stevedoring companies or other employers at any of the docks it picketed in Philadelphia, Houston or Galveston. On the surface, the NMU's object was informational—to appeal to the public and to the MEBA rank-and-file so that they would protest against the allegedly unlawful picketing of the Maximus. But NMU made no attempts in any of the three ports to publicize by mass communications its dispute with MEBA, nor was there picketing of MEBA's headquarters. Likewise, there was a failure to inform longshoremen that it would be permissible for them to cross the picket lines and no plan was instituted, despite requests, to alter the method of picketing in order to permit the work to resume. In fact, in all ports the leaflets distributed were addressed not alone to MEBA members, but to all union men, exhorting them to cooperate with NMU in fighting MEBA and warning the shipowners and stevedoring companies that if they were unable to "stand up to outfits that try to put pressure on them in a phony beef, then they're really going to be in trouble."

Upon the foregoing facts the National Labor Relations Board found that NMU had violated § 8(b) (4) (i) (ii) (B), 29 U.S.C. § 158(b) (4) (i) (ii) (B), by inducing and encouraging employees of Weyerhaeuser, Calmar, Hinkins and Nacirema and employees of certain Houston and Galveston stevedoring companies to refuse to perform services for their employers and by threatening and coercing neutral employers with an object of forcing or requiring them to cease doing business with each other. The Board conceded that in each case NMU's ultimate object—protecting itself in a representation dispute with a rival union—was lawful. Under these circumstances, peaceful picketing directed solely at MEBA members and publicity directed at the unorganized public would have been beyond the purview of the statute. The Board concluded, however, that the immediate aim and purpose of the picketing was to exert economic pressure on the employers involved through cessation of business to compel them to cause MEBA to end the controversy on the Maximus, and hence the picketing was violative of § 8(b) (4) (i) (ii) (B). In each case it ordered NMU to cease and desist from the unfair labor practices found and to post appropriate notices.

The petitioner asks for a review of these orders and a denial of enforcement on the grounds (1) that the controversy here does not constitute a "labor dispute" within the definition of those words in § 2(9) of the Act, 29 U.S.C. § 152(9), and that therefore the Board had no jurisdiction, (2) that because the real dispute here was with MEBA, another union, and there was no dispute with a "primary employer," there could be no "secondary boycott" within § 8(b) (4), 29 U.S.C. § 158(b) (4), and, (3) that the Board's order infringed NMU's right of free speech.

▪▪▪▪ We are satisfied that the controversy with which this case is concerned is a "labor dispute" within the definition of § 2(9). It is a controversy which concerns the association or representation of persons in maintaining terms or conditions of employment. It is true as the petitioner states that NMU had no quarrel at the time with Cambridge as the owner of S. S. Maximus with whom NMU had a contract. It was, however, by affirmative action of its own, seeking to fend off or retaliate for picketing of the S. S. Maximus by MEBA in their continuing warfare to gain or retain the upper hand in representing maritime employees. Several employers and their employees were directly affected. Both the purposes of the Act and the definition of "labor dispute" are broad and encompass the factual circumstances here presented. The definition of "labor dispute" in this Act and in the Norris-LaGuardia Act, § 13(c), 29 U.S.C. 113(c), are virtually identical. In Milk Wagon Drivers' Union, Local No. 753 etc. v. Lake Valley Farm Products, Inc., 311 U.S. 91, 99–100, 61 S.Ct. 122, 126, 85 L.Ed. 63 (1940), the Supreme Court said:

"This merely transformed the defendants' activities from an effort to organize non-union men to a conflict which included a controversy between two unions. A controversy 'concerning the association or repre-

sentation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment' is expressly included within the definition of a labor dispute in the Norris-LaGuardia Act."

We see no reason why the same definition should be given a narrower construction or interpretation for the broad purposes of the Labor Management Relations Act. The petitioner advances as a reason for doing so that in the Norris-LaGuardia Act there are, in addition to the definition of "labor dispute" in § 13(c), the provisions of § 13(a) which describe the parties which must be implicated to constitute cases which "involve or grow out of a labor dispute." From this it argues that the absence of a provision in the Labor Management Relations Act, similar to § 13(a) of the Norris-LaGuardia Act, compels the conclusion that the Board's jurisdiction under § 2(9)—a provision which it claims is "narrower" in its scope than § 13 of the Norris-LaGuardia Act, read in its entirety—does not extend to inter-union controversies. This argument is not persuasive. The effect of § 13(a), though broad in itself, is to limit the cases which can be held to "involve or grow out of" a labor dispute. It does not change the definition of a labor dispute in the least. The Labor Management Relations Act contains no such limitation. Moreover, in Milk Wagon Drivers' Union the Supreme Court did not concern itself with § 13(a) for its interpretation of the definition of "labor dispute." Matson Navigation Company v. Seafarers International Union, 100 F.Supp. 730 (D.Md. 1951). It also appears that for the purpose of determining whether particular union activity is subject to § 8(b) (4) of the National Labor Relations Act and that state jurisdiction over the matter is thereby displaced, no distinction is made between secondary activity which is a part of a controversy between a union and an employer or between two unions. San Diego Building Trades Council etc.

v. Garmon, 359 U.S. 236, 79 S.Ct. 773, 3 L.Ed.2d 775 (1959); Weber v. Anheuser-Busch, Inc., 348 U.S. 468, 75 S.Ct. 480, 99 L.Ed. 546 (1955).

The character of the underlying dispute in the present case comes well within the statutory definition  It is not merely peripheral to it or completely outside of it as was the case in National Labor Relations Board v. International Longshoremen's Association, 332 F.2d 992 (4th Cir. 1964) in which the cause of work stoppage was purely political, i. e. refusal to load cargo on a vessel because it was destined for delivery to Cuba.

The Petitioner also asserts that there can be no violation of § 8(b) (4) unless there exists a dispute with a primary employer. In effect it argues that § 8(b) (4) was enacted to prohibit the use of a secondary boycott and that a secondary boycott cannot exist unless there is a dispute between the union and a primary employer. The statute does not use either the term "secondary boycott" or the term "primary employer." It is true that these words frequently appear in the legislative history for the reason that they assist in describing the most usual form of the kind of activity Congress intended to proscribe but Congress did not use those terms in the statute nor did the Senators and Representatives show by using them in debates and reports that the operation of the statute was to be coextensive with the usual meaning of those terms. Indeed, the Supreme Court has said that all secondary boycotts were not outlawed in § 8(b) (4) (A), which is the present § 8 (b) (4) (B).

" 'The section does not speak generally of secondary boycotts. It describes and condemns specific union conduct directed to specific objectives. * * * Employees must be induced; they must be induced to engage in a strike or concerted refusal; an object must be to force or require their employer or another person to cease doing business with a third person. * * * ' "

Local 761, Int'l Union of Elec. Workers etc. v. National Labor Relations Board, 366 U.S. 667, 672–673, 81 S.Ct. 1285, 1289, 6 L.Ed.2d 592 (1961). Likewise it may be said that the statute proscribes certain union conduct, directed to a specific objective, which does not fall squarely within a strict definition of secondary boycott but which is sufficiently analogous to it to be encompassed within "the broad and somewhat vague concept of secondary boycott" as the term was used in congressional debate and plainly within the kind of conduct Congress intended to prohibit.

In Local 761, Int'l Union of Elec. Workers etc. v. National Labor Relations Board, supra, Mr. Justice Frankfurter also said, at p. 672, 81 S.Ct. 1285, with respect to § 8(b) (4) (A) [now (B)] that it could not be literally construed; otherwise it would ban most strikes historically considered to be lawful.

In interpreting the subsection the courts have reduced it in its effect to something less than its broad literal wording, not to conform to legislative predilections of their own, but on the necessary assumption that Congress intended to proscribe peaceful picketing only where such prohibition was necessary to stop union conduct which experience had shown to be damaging and undesirable and where there was, therefore, a reasonable basis for preventing conduct which otherwise could not be forbidden because of the First Amendment. As a natural consequence of this assumption, the courts have required that the acts sought to be prohibited plainly appear from the legislative history to be included within the kind or type of harmful conduct Congress meant to prevent. National Labor Relations Board v. Fruit & Vegetable Packers & Warehousemen, Local 760, 377 U.S. 58, 63, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964).

In the process of interpretation the courts have also been mindful of the effort by Congress, in passing the Labor Management Relations Act, to balance the need, on the one hand, to preserve the

"normal flow of commerce," and the need, on the other hand, to preserve the right to strike as an essential of free collective bargaining.

"The character of the problem of reconciliation of the right to strike with the limitations expressed in § 8(b) (4) is not unlike that which confronted the Court in Allen Bradley Co. v. Local Union No. 3, 325 U.S. 797, 806, 65 S.Ct. 1533, 1538, 89 L. Ed. 1939:

" 'The result of all this is that we have two declared congressional policies which it is our responsibility to try to reconcile. The one seeks to preserve a competitive business economy; the other to preserve the rights of labor to organize to better its conditions through the agency of collective bargaining. We must determine here how far Congress intended activities under one of these policies to neutralize the results envisioned by the other.' " National Labor Relations Board v. International Rice Milling Co., 341 U.S. 665, at 673, n. 7, 71 S.Ct. 961, at 965, 95 L.Ed. 1284 (1951).

In considering and applying these principles we are of the opinion that Congress did not intend to confine the effect of § 8(b) (4) to a strict or precise definition of the term "secondary boycott" nor did it intend to require the existence of a "primary employer" as a prerequisite to the applicability of the subsection.

Attention must instead be turned to a consideration of the evils Congress sought to eliminate in enacting § 8(b) (4). In National Labor Relations Board v. Denver Building & Construction Trades Council, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284 (1951), the Court declared that Congress' purpose was to shield "unoffending employers and others from pressures in controversies not their own." See also Miami Newspaper Pressmen's Local No. 46 v. National Labor Relations Board, 116 U.S.App.D.C. 192, 322 F.2d 405 (1963). Whether the striking union is at war with a primary employer and puts damaging economic pressure on a neutral employer with the design of increasing the economic pressure on the primary employer through such secondary activity or is, instead, at war with another union and, in adopting secondary activity, is using damaging economic pressure on a neutral employer to achieve its objective of prevailing over the rival union, makes no logical difference in the light of the clear purpose and intention of Congress to confine the warfare to an area which includes direct action against the principal antagonist whether it be a primary employer or a rival union and which would exclude the use of economic pressure by a union against neutral employers as an indirect means of exerting force against the union's principal target. Of course, exceptions have been recognized in so-called "situs" cases where damage to the secondary employer is only an incidental by-product of the action taken directly against the primary target and it is not an object of the union to use pressure on the secondary employer for that purpose. New Power Wire and Electric Corp. v. National Labor Relations Board, 340 F.2d 71 (2d Cir. 1965); National Labor Relations Board v. Local 294, Int'l Brotherhood of Teamsters, 284 F.2d 887 (2d Cir. 1960); Seafarers Int'l Union etc. v. National Labor Relations Board, 105 U.S.App.D.C. 211, 265 F.2d 585 (1959); Sailors' Union of the Pacific (Moore Drydock Co.), 92 N.L.R.B. 547 (1950). See also § 8(b) (4), (e) of the Act. Exceptions also appear in the proviso of § 8(b) (4) and § 8(b) (7) (C) concerning informational picketing. But these do not include cases such as that now before us.

Secondary economic pressure generated in a controversy over representation or jurisdiction has no less an impact on neutral employers than where secondary activity is resorted to in furtherance of a dispute with a primary employer. Congress' concern for neutral employers in these situations is no less great. It is absurd to suppose that Congress intended

to afford the protection to unoffending neutral employers from a contest between an offending employer and its union employees but that it did not intend to afford protection to neutral unoffending employers when the employer itself was also unoffending. It certainly makes little difference to the neutral employer whether the damage he suffers is the result of a blow being delivered by the union against a primary employer or against another union. But even though Congress was doubtless motivated by a feeling that it was inherently unfair to permit unlimited injury to an innocent bystander, the most compelling reason for prohibiting such secondary activities was that the damage and disruption to the normal flow of commerce, which was an inevitable consequence, far outweighed the need of the unions for such a weapon in effective collective bargaining. See Labor Management Relations Act, 1947, I Leg. Hist. 481 and II Leg. Hist. 1047, 1108, 1368.

The petitioner relies strongly upon Douds v. International Longshoremen's Association, Independent, 224 F.2d 455 (2d Cir.), cert. denied 350 U.S. 873, 76 S.Ct. 117, 100 L.Ed. 772 (1955). In that case a divided panel of this court held that a secondary strike to advance a union's position in a contest for representation with another union did not constitute a violation of § 8(b) (4). The members of the International Longshoremen's Association, Independent who were employees of the New York Shipping Association, which operated steamships, stevedoring companies, etc., refused to serve, at New York piers, trucks driven by A. F. of L. drivers because the trucks had refused to cross a picket line set up at the piers by a rival longshoremen's union which was A. F. of L. affiliated. This caused an almost complete cessation of business at the piers. The majority of the court held (L. Hand, J.), that, inasmuch as the ultimate objective of the independent union was to win out in a struggle with the A. F. of L. affiliated union for control of the port, it did not

matter that the means used to achieve that end or any intermediate objectives that may have been entertained violated § 8(b) (4) because the final objective was legitimate. It also found that the facts did not fit the usual meaning of "secondary boycott" at the same time noting that § 8(b) (4) goes further than prohibiting secondary boycotts in the usual meaning of that term. All of the activity under consideration in the case took place at certain piers in New York City where the employer carried on its business and where incoming and outgoing cargoes were dealt with by longshoremen who received them from or delivered them to truckers, to be taken aboard the ships or delivered to consignees, as the case might be. While the court did not expressly treat this as a "situs" case, the particular circumstances generated the innumerable complexities which characterize those cases. Everything took place at the premises where the employer's business was located. Neither of the struggling union contestants had the right to represent the employees. An election had been held but the result was under review and had not been determined. That some union should have the right to represent the employees was vital to the very existence of free collective bargaining and the contest between the unions was closely bound to the rights of the employees to have someone bargain for them. Difficulties, later cured by the 1959 amendment to § 8(b) (4) and by § 8(b) (7), added to the complexities of the case. It is evident that this court endeavored to cut the Gordian knot by adopting the premise that, if the ultimate objective of the union was legitimate, § 8(b) (4) was not at all concerned with how, on the facts there presented, the union achieved it. The circumstances of the present case are obviously quite different in that the activity indulged in here encompassed widely scattered employers and employees who had no direct connection with the inter-union contest going on at Pier 84, South, in Philadelphia. Moreover, both MEBA and NMU

had outstanding contracts which, between them, covered all maritime employees directly concerned, so that no group was struggling to achieve representation, for collective bargaining purposes, in a situation where it had none. We do not feel that the principles enunciated in Douds v. International Longshoremen's Association, Independent, supra, should be employed in deciding the present case. To apply to this case the concept that § 8(b) (4) interdictions are not to be considered if the final object of the union is lawful, would place the decision of this case at odds with the statute which requires only that *an* object (not the ultimate object) of the strike or refusal to transport, handle, etc., is forcing any person to cease doing business with any other person. It would be at odds with the Supreme Court's statement in National Labor Relations Board v. Denver Building & Construction Trades Council, supra, 341 U.S. at 689, 71 S.Ct. at 952, that:

> "It is not necessary to find that the *sole* object of the strike was that of forcing the contractor to terminate the subcontractor's contract. This is emphasized in the legislative history of the section."

See also Local 1976, United Brotherhood of Carpenters and Joiners of America AFL-CIO v. National Labor Relations Board, 357 U.S. 93, 98, 78 S.Ct. 1011, 2 L.Ed.2d 1186 (1958). It has had no persuasive following in other circuits which have passed upon cases under § 8(b) (4) in which the lawful ultimate object theory could have been followed. National Labor Relations Board v. Local 101, International Union of Operating Engineers, AFL-CIO, 315 F.2d 328, 330 (10th Cir. 1963); Local No. 636, United Association of Journeymen and Apprentices of Plumbing and Pipe Fitting Industry of United States and Canada, AFL-CIO v. National Labor Relations Board, 109 U.S.App.D.C. 315, 278 F.2d 858 (1960); Amalgamated Meat Cutters and Butcher Workmen of North America, AFL, Local 88 v. National Labor Relations Board, 99 U.S.App.D.C. 24, 237 F.2d 20 (1956); National Labor Relations Board v. Local 11, United Brotherhood of Carpenters & Joiners of America, AFL, 242 F.2d 932 (6th Cir. 1957). Cf. National Labor Relations Board v. United Brotherhood of Carpenters and Joiners of America, AFL-CIO, 261 F.2d 166 (7th Cir. 1958).

This court has not applied such a doctrine in any related case since Douds was decided nor has it been discussed nor has reference been made to it. National Labor Relations Board v. Local 294, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, 273 F.2d 696 (2d Cir. 1960); National Labor Relations Board v. Local 294, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, 284 F.2d 887 (1960); National Labor Relations Board v. Milk Drivers and Dairy Employees Local Union No. 584, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, 341 F.2d 29 (2d Cir. Jan. 26, 1965).

The respondent Labor Board found the facts recited above; the findings are fully supported by the evidence. The Board concluded that NMU's picketing at Philadelphia, Houston and Galveston induced and encouraged individuals employed by steamship agents, stevedoring companies and marine warehouse operators in those parts to strike and to refuse in the course of their employment to perform services for their employers within the meaning of § 8(b) (4) (i) and that the picketing constituted coercion and restraint of those employers within the meaning of that section, and that the object of this conduct was to bring about a cessation of business at the particular piers between the employers mentioned and the owners and operators of the vessels and anyone else doing business with any of them at the piers. We find no error in these conclusions; they are amply supported by the record as a whole. The petitioner takes particular

exception to the use by the Hearing Examiner of the term "foreseeable consequences," in connection with the work stoppage following the establishment of one or more of the picket lines, as an element in the proof that this was "signal" picketing. Such a phrase, with its tort implications, is not descriptive of a proper basis for concluding that picketing is signal picketing because a work stoppage might be highly probable in response to what was genuinely intended to be nothing more than informational picketing and the union might immediately after such stoppage make it clear to all concerned that no such result was intended. Under such circumstances there would be no violation of § 8(b) (4) even though a reasonably prudent man would have foreseen that such cessation of business would occur. In this case both from what the union said and did and \from what it failed to say and do to make clear that no work stoppage was sought, there was ample evidence, separate and distinct from any consideration of foreseeability, to show that cessation of business was what the union intended to achieve all along and that its activity was in fact "signal picketing." The use of the phrase was harmless under these circumstances.

■ Having determined that the Board was correct in concluding that an object of petitioner's picketing was to induce work stoppages among employees of secondary employers to force such employers, through economic pressure, to support petitioner's retaliation against MEBA, in violation of § 8(b) (4), we find that there is no substance to the petitioner's claim that its rights under the First Amendment to the Federal Constitution have been impaired. International Brotherhood of Electrical Workers v. National Labor Relations Board, 341 U.S. 694, 705, 71 S.Ct. 954, 95 L.Ed. 1299 (1951).

The petitions to review are dismissed and enforcement is granted on both of the cross-petitions.