**Sidney DANIELSON, Regional Director, Region 2 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board, Petitioner,**

v.

**FUR DRESSERS, LOCAL NO. 2F, AMALGAMATED MEAT CUTTERS AND BUTCHERS WORKMEN OF NORTH AMERICA, AFL–CIO, et al., Respondents.**

No. 75 Civ. 3438.

United States District Court, S. D. New York.

Oct. 3, 1975.

Peter G. Nash, Gen. Counsel, Washington, D. C., for petitioner; Alexander P. Rosenberg, Raymond P. Green, New York City, of counsel.

Cammer & Shapiro, P. C., New York City, for respondent FLM Joint Board; Harold I. Cammer, New York City, of counsel.

Markewich, Rosenhaus, Markewich & Friedman, P. C., New York City, for respondents Locals 2 and 3; Robert Markewich, New York City, of counsel.

## OPINION AND ORDER

KEVIN THOMAS DUFFY, District Judge.

Sidney Danielson, Regional Director for Region 2 of the National Labor Relations Board (hereinafter "NLRB") has petitioned on behalf of the NLRB for an order pursuant to § 10(*l*) of the National Labor Relations Act (hereinafter "NLRA"), 29 U.S.C. § 160(*l*), enjoining (1) the Fur Dressers, Local No. 2F, (2) the Fur and Floorworkers Union, Local 3, and (3) the Joint Board of Fur Leather and Machine Workers, all of the Amalgamated Meat Cutters and Butchers Workmen of North America, AFL–CIO, from engaging in conduct allegedly violative of § 8(b)(4)(ii)(B) of the NLRA, 29 U.S.C. § 158(b)(4)(ii)(B).

The facts giving rise to the petition were presented at a hearing before me and are as follows. South American Fur and Skin Co., Inc. (hereinafter "South American"), a New York corporation, imports furs and skins from Southern Skin Trading Corp. (hereinafter "Southern Skin"), an Argentinian corporation. Apparently, according to Argentinian law, a maximum of 20 per cent of the skins exported by a given company may be "raw" or unprocessed skins. The balance of skins exported must first be "dressed" or processed. Since coming into existence in April of 1975, South American has imported dressed skins.

Pursuant to an agreement with Mirode Co., a New Jersey company, South American sends the imported dressed skins to Mirode for some additional processing before selling the skins to manufacturers. Mirode apparently has a collective bargaining agreement with a local of the International Brotherhood of Teamsters. Respondent Locals 2F and 3 at one time had been involved in a representation dispute with Mirode which had occasioned the filing by Mirode, with the Newark office of the NLRB, of an unfair labor practice charge against the two locals. That dispute was settled by a consent order without any finding or admission of culpability by the locals.

In late April and early May, Philip Fabrykant, President and sole employee of South American, was approached on various occasions by Henry Foner, the president of respondent Joint Board of Fur Leather and Machine Workers, by Jack Mazin and Seymour Sobin of Local 2F, and by Paul Catani of Local 3, all of whom expressed displeasure with South American's importation of dressed skins. According to Mr. Fabrykant the representatives of respondents warned him that he would have "trouble", that customers would return skins as defective, and that the unions would picket his business if the importation of dressed skins was not curtailed.

There was also a suggestion that Fabrykant send the dressed furs out to union shops for additional processing at the full cost of dressing, in which case no picketing would be caused by the union

organizers. Fabrykant apparently rejected this suggestion as economically infeasible.

On May 8, 1975, the respondents commenced picketing South American. The signs read:

Please Save Our Jobs
Don't Buy Argentine Dressed Fur Skins
Sold by South American Fur &
Skin Company
Local 2F and 3F, Joint Board, AMC
This is an appeal to consumers
and customers and
not to employees.

According to respondents, their picketing was prompted by a desire to preserve and create jobs for members of the unions in an allegedly dying industry. Various union and industry members testified to the attrition over recent years in the number of jobs and work available to fur dressers in New York.

On May 9, 1975, when Mirode employees came to pick up some skins, Mazin and Catani allegedly warned Fabrykant that if he allowed the skins to leave the store that Fabrykant would be "a dead man in the market." On May 12, 1975, when Mirode employees returned with the skins a fight developed between the pickets and the Mirode employees.

At the hearing on the petition, respondent Locals 2F and 3 agreed to the entry of an order enjoining them from engaging in any violence, interfering with pickups and deliveries, and from blocking the ingress or egress from South American.[1] They argued that the basis for their consent was that the incidents mentioned above would not be repeated and should not bear on the question of whether the picketing by itself justified the entry of a § 10(*l*) injunction.

The NLRB, in support of its petition for a § 10(*l*) injunction, argues that the respondents have no primary dispute with South American. Arguably, according to petitioner, the respondents have disputes with Mirode and Southern Skins, both of whom are the ultimate targets of respondents' picketing of South American, a neutral. That is, the object of the picketing is to force South American to cease doing business with Mirode and Southern Skins.

In any case, petitioner contends that a dispute with a primary employer is not a *sine qua non* of a § 8(b)(4)(ii)(B) violation. See *National Maritime Union v. N.L.R.B.,* 342 F.2d 538, 543 (2d Cir.), *cert. denied,* 382 U.S. 835, 86 S.Ct. 78, 15 L.Ed.2d 78 (1965). As long as the prohibited purpose of forcing a neutral to cease doing business with another is present, so the argument runs, the Act is violated.

The Second Circuit has recently ruled in *Danielson v. Joint Board of Coat, Suit & Allied Garment Wkrs. Union,* 494 F.2d 1230 (2d Cir. 1974), that the district court is not a mere rubber stamp in petitions by the NLRB for § 10(*l*) injunctions. Among the standards mentioned by that court were a true "reasonable cause" standard, a significant possibility that the Board could enter an enforceable order, or that the district court not be convinced that the General Counsel's legal position is wrong. Given this standard, a meaningful examination of the merits is necessary.

In the course of my examination of this case, several problems have arisen. I have serious doubts as to whether or not a labor dispute of any sort is in fact present in this case. In fact, the NLRB admitted at the hearing that there may well be no labor dispute. If there is no labor dispute, at best the case presents the question as to whether a United States labor organization can voice its opposition to a policy of a foreign government.

As noted above, the NLRB relies on the *National Maritime Union* case for the proposition that a dispute with a primary employer is not necessary in a § 8(b)(4)(B) case. In that case, however, there was a dispute between two rival unions which the court found to be a true labor dispute affecting employers and employees.

In deciding that case the Second Circuit distinguished a case more nearly in

---

1. Because of the disposition of this case by this opinion no order has been signed pursuant to the stipulation.

point with my inquiry to the NLRB as to where the labor dispute lies in this case. In *N.L.R.B. v. International Longshoremen's Assoc.*, 332 F.2d 992 (4th Cir. 1964) the court refused to enforce a cease and desist order of the NLRB because it found no labor dispute had been presented over which the NLRB had jurisdiction.[2] There a refusal by the union to supply men to unload a ship which had engaged in trade with Cuba was found to be a purely political action, not one based on the "terms . . . or conditions of employment." See 29 U.S.C. § 152(9) for the definition of "labor dispute." Absent any "labor dispute," the Fourth Circuit held that there was no jurisdiction under the NLRA for the issuance of the order.

In subsequent cases the *International Longshoremen's* case has been often distinguished on the facts. Almost uniformly courts have held that the particular situation present in the *International Longshoremen's* case was a purely political dispute as opposed to the labor-type disputes generally presented. See, e. g., *N.L.R.B. v. Twin City Carpenters Dist. Council*, 422 F.2d 309 (8th Cir. 1970); *Mountain Navigation Co., Inc. v. Seafarers Int'l Union of North America*, 348 F.Supp. 1298 (W.D.Wis.1971). In a case closely related to the *National Maritime Union* case discussed above, the D. C. Circuit criticized the reasoning in *International Longshoremen's* and noted that the term "labor dispute" is neither mentioned in § 8(b)(4)(ii)(B) nor does the NLRA require a "labor dispute" as a jurisdictional prerequisite. *National Maritime Union v. N.L.R.B.*, 120 U.S. App.D.C. 299, 346 F.2d 411, 415, *cert. denied* 382 U.S. 840, 86 S.Ct. 90, 15 L.Ed.2d 82 (1965).

This petition presents a factual situation closer to *International Longshoremen's* than other cases dealing with the problem. Arguably, the respondents' concerns are more work-related than political and therefore may well fall within the broad definition of a "labor dispute" as a "controversy concerning terms . . . or conditions of employment . . . *regardless of whether the disputants stand in the proximate relation of employer and employee.*" 29 U.S.C. § 152(9) (emphasis added).

However, to the extent that a labor dispute does exist, if it does, in this case I am convinced that the dispute is with South American, the company being picketed. The dispute centers on the unions' displeasure with South American's importation of dressed skins. It is this practice which they seek to halt.

Clearly this is not the classical secondary boycott situation where a union, in an attempt to affect a primary employer with which it has a dispute, pickets a secondary or neutral party. Nor is this a case like the *National Maritime Union* cases where there was no primary employer, but the boycotted shipowners were clearly neutrals in the dispute. Those cases found the neutrality of the victim to be a central concern. See 346 F.2d at 418–19; 342 F.2d at 543–44. Here, the picketed company is not a neutral victim of some unrelated labor dispute. I find that neither Mirode nor Southern Skins is the primary object of a dispute in which South American is a neutral.

Either no labor dispute exists in which case I am inclined to adopt the Fourth Circuit's reasoning that jurisdiction is lacking[3] and the picketing is protected

---

**2.** An alternative ground for the Fourth Circuit's refusal to enforce the order was its finding that no unfair labor practice had been committed.

**3.** The Fourth Circuit's conclusion has additional appeal if § 10(*l*) is read as an exception to the anti-injunction provisions of the Norris-LaGuardia Act which apply only where there exists a "labor dispute." See 29 U.S.C. § 101. See also *Sears, Roebuck & Co. v. Carpet, Lino-*

*leum, Soft Tile and Resilient Floor Covering Layers, Local Union No. 419*, 410 F.2d 1148 (10th Cir. 1969). Section 113(c) of Title 29, U.S.C., the definitional section on "labor dispute" of the Norris-LaGuardia Act, is almost identical to 29 U.S.C. § 152(9), the definitional section in "labor dispute" in the NLRA.

A portion of the Senate Committee Report on § 10(*l*) explained that because of the nature of certain unfair labor practices "the com-

by the First Amendment, or a labor dispute exists in which South American is the primary rather than neutral target and therefore the picketing is protected by the primary picketing proviso to § 8(b)(4)(ii)(B).

It was the NLRB's position in its petition for an injunction that "Respondents have no primary labor dispute with South Amerocan" [sic]. I find myself convinced that either the position of the NLRB is wrong on this point or the real dispute is with the Argentinian laws—a situation involving international lobbying and activity protected by the Bill of Rights, United States Constitution, Amendments 1–10. Such a situation does not require this Court to enter the requested order.

For all the reasons enunciated above the petition for an injunction is denied and the cause dismissed. See *Danielson v. Joint Board of Coat, Suit & Allied Garment Wkrs. Union,* 494 F.2d 1230 (2d Cir. 1974).

SO ORDERED.

mittee is convinced that additional procedures must be made available under the National Labor Relations Act in order to adequately protect the public welfare which is inextrica-bly involved in a labor dispute." S.Rep.No.105 on S. 1126, p. 8, quoted in *Amazon Cotton Mill Co. v. Textile Workers Union,* 167 F.2d 183 (4th Cir. 1948).