**Charles T. DOUDS, Regional Director, Petitioner,**

**v.**

**INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, INDEPENDENT, et al., Respondents.**

**No. 292, Docket 23491.**

United States Court of Appeals Second Circuit.

Argued May 12, 1955.

Decided June 24, 1955.

Norman S. Beier, New York City, for Harold Bowers, Local 824 of International Longshoremen's Ass'n, Independent.

Gerome J. Leone, New York City, for William P. Lynch, appellant.

Joseph H. Broderick and Edward V. Broderick, New York City, for William Ackalitis, appellant.

Brenner, Hannan & Murphy, George A. Brenner, Thomas Sheehan, New York City, for International Longshoremen's Ass'n, Independent, and Locals 856, 874, 895, 920, 975, 1258.

Samuel Ross, Washington, D. C., Theophil C. Kammholz, General Counsel, Chicago, Ill., David P. Findling, Associate General Counsel, Winthrop A. Johns, Asst. General Counsel, James V. Constantine, Attorneys, National Labor Relations Board, Washington, D. C., for appellee.

Before HAND, SWAN and FRANK, Circuit Judges.

HAND, Circuit Judge.

This is an appeal by the respondents—three individuals, the "International Longshoremen's Association, Independent," and eight of its "Locals"—from an order of Judge Burke, imposing prison sentences and fines as punishment for contempt of an order of the District Court for the Southern District of New York, issued on March 4, 1954 in a proceeding brought by the petitioner, Douds, as Regional Director of the National Labor Relations Board under § 10(*l*) of the Labor-Management Relations Act.[1] We quote in the margin the relevant parts of the order.[2] The contempt proceeding was begun by an order to show cause, up-

1. § 160(*l*) of Title 29 U.S.C.A.

2. "Now, therefore, upon the above, it is ordered that respondents International Longshoremen's Association, Independent, and Locals 791, 856, 824, 874, 895, 920, 975 and 1258, International Longshoremen's Association, Independent, and each of them, their agents, servants,

on the return of which the respondents filed answers; and the issues so arising were tried to a jury, which returned a verdict against the respondents, on which the court imposed the sentences in question. We shall speak of the respondent, "International Longshoremen's Association, Independent," as the "Independent"; of "Local 807," a truck drivers' affiliate of the "American Federation of Labor," as "807"; of the New York Shipping Association as the "Association"; and the "American Federation of Labor" as "AFL."

In 1953 the "Association" was a combination of about 170 employers in the Port of New York who operated steamships, stevedoring companies, warehouses and the like. The "Independent," a longshoremen's labor union, had been preceded by an earlier union of the same name which was an affiliate of "AFL," and consisted of a group of "locals," comprising substantially all the longshoremen in the Port. For reasons not here relevant, in the fall of that year "AFL" expelled this affiliate, and chartered in its stead another longshoremen's union, which was an affiliate, which we shall speak of as "AFL–ILA," and which at once began to try to draw members away from the "Independent" in the hope of getting itself certified as the representative of all the longshoremen in the Port. On October first the "Independent," not being able to come to any agreement with the "Association," called a longshoremen's strike, which the district court enjoined for 80 days under § 208 of the Labor Management Relations Act, 29 U.S.C.A. § 178, upon the motion of the Attorney General. In obedience to that order the "Independent" went back to work; but "AFL–ILA," believing that it had secured the adherence of a majority of the longshoremen, filed a petition with the Labor Board for certification as their representative. An election was held on December 23 and 24, at which the "Independent" got a majority; but the Board refused to grant it a certificate because of the methods that "AFL–ILA" alleged it to have employed. While the Board was conducting hearings on these objections, the district court on March 4, 1954 granted ex parte the injunction, whose disobedience was the subject of the prosecution now at bar.

The occasion for that injunction was as follows. One, McMahon, a longshoreman, had been a member and "shop steward" of one of the locals of the original International Longshoremen's Association; but he had resigned, had joined "AFL–ILA," and had been employed on Pier 32 by the Moore-MacCormack Line. The longshoremen at that pier who were members of the "Independent" refused to work with McMahon and struck. He was then discharged and the striking members went back to work. However, McMahon picketed the pier, wearing a tabard with the customary legend; and the drivers of most of the trucks that fetched shippers' goods to and from Pier 32, who were members of "807," refused

employees, attorneys and all other persons in active concert or participation with them, be and they hereby are enjoined and restrained until March 9, 1954, at 5:00 p. m., and not longer, without further order of this Court, from:

"Engaging in, or, by orders, directions, instructions, appeals, or other means, or by permitting any such to remain in existence or effect, inducing or encouraging the employees of members of New York Shipping Association and of other employers to engage in, strikes or concerted refusals in the course of their employment, to use, process, transport or otherwise handle or work on any goods, articles, materials or commodities, or to perform services for their employers, where objects thereof are (1) to force or require members of New York Shipping Association and other employers to cease doing business with trucking concerns employing members of Local 807, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL, and (2) to force or require customers of trucking concerns employing members of Local 807, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL, to cease doing business with said trucking concerns; * * *."

to cross McMahon's picket line, in protest against his discharge. Thereupon the "Independent" refused to serve any trucks driven by members of "807," at any of the piers in the Port, which resulted in an almost complete tie-up. This situation induced the petitioner to bring the proceeding here in question; the first step in which was the ex parte injunction, disobedience of which is the subject of this appeal. After the order was obtained the longshoremen belonging to the "Independent" went on a general strike all over the Port.

Nearly all the respondents deny that they knew of the terms of the order, which forbade, not only the conduct described, but allowing it to continue after the order had been entered; but we shall assume, arguendo, that there was enough evidence to support a finding, not only that they did learn of it, but that they either actually counselled or directed the men to continue to refuse to serve the trucks, and eventually to strike against the "Association." Although there is nothing in the record to show that the "Association" had any contract with the trucking companies, or that the shippers of goods to and from the piers did not deal directly with them, it is common ground that the "Association" was "doing business" with the companies, and that the shippers were their "customers." Again, there is no evidence that the "Association," under compulsion of the "Independent," broke off any business that it was doing with the trucking companies, or that the shippers did the same. Indeed, it does not appear that there were no other than "807" drivers available to carry goods to the piers; but it is to be assumed that there were not as many available as were necessary, so that the "Independent's" refusal to serve the "807" drivers as we have said effected a substantial tie-up of the Port, before the strike which occurred after the ex parte injunction had been granted.

The evidence is that the refusal to serve the trucks was a reprisal and retaliation against the "807" drivers for their refusal to cross McMahon's picket line; but obviously, both the drivers' refusal at Pier 32 and the longshoremen's refusal to serve the trucks at all the piers were steps in the contest for control of the Port, because it will be remembered that "807" was an affiliate of "AFL," like "AFL–ILA."

The judge told the jury that the refusal to serve the trucks, taken independently of the strike, was unlawful, if its "object was to force the employers of the men working on the piers to cease doing business with trucking concerns employing 807 drivers"; or if it had the "object" of forcing "customers of the trucking concerns employing 807 drivers to cease doing business" with them. In that case they should convict; but if on the other hand they found that the strike was not a subterfuge to cover the refusal, they should acquit. We are therefore to assume that the jury found that the strike was a "subterfuge"; and that they had acted upon the ruling that the refusal to serve the trucks was of itself a disobedience of the order. We shall for the moment assume that whatever was a violation of § 8(b) (4) (A), 29 U.S.C.A. § 158(b) (4) (A), was disobedience of the order and address ourselves to whether the refusal was such a violation. It was not, we think, within the three most recent decisions of the Supreme Court construing the section.[3] In the first place it was not a "secondary boycott" in the usual meaning of that term; for that presupposes a labor dispute between the employees of one employer, with whom another employer has business relations, as a customer, or as the source of his material, or the like. It further presup-

3. National Labor Relations Board v. International Rice Milling Co., 341 U.S. 665, 71 S.Ct. 961, 95 L.Ed. 1277; National Labor Relations Board v. Denver Building & Construction Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L. Ed. 1284; International Brotherhood of Electrical Workers v. National Labor Relations Board, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299; Local 74 v. National Labor Relations Board, 341 U.S. 707, 71 S.Ct. 966, 95 L.Ed. 1309.

poses that the employees of the second employer, wishing to make common cause with those of the first, strike, or threaten to strike, against their own employer, unless he will discontinue his relations with the first, by this means putting pressure on the first to come to terms with his own employees. Section 8(b)(4)(A) does indeed go further than that; for in the three decisions that we have cited, the employees were not helping the employees of another employer in a dispute between them and him. Nor had they any dispute with their own employer as to the conditions of work or bargaining representative. On the contrary, their only "object" was to promote the general solidarity of unionism by refusing to work with non-union men, even though these were in a different craft from theirs. In the case at bar it is true that the "807" drivers were in a different craft from the longshoremen; but the "object" of the "Independent's" refusal to serve their trucks was not to advance the union solidarity, but a move against "807" for taking part in the dispute between itself and "AFL–ILA." If this was within the statute it means that a union may not advance its own cause in a dispute with another to gain representation, if the step it takes causes a cessation of business between its employer and a third person, or between two third persons. It is one thing to say that such interference is unlawful when its "object" is the promotion of unionism in general, and a very different thing to forbid such a sanction as part of the contest for control. We start therefore with the premise that, if the section goes so far, it ought to appear very plainly in the text, and we do not think that it does.

Turning then to the text, we are to ask whether it was an "object" of the "Independent's" refusal to serve the trucks to force the "Association" "to cease doing business with the trucking concerns" or to force "customers" of "the trucking concerns" to "cease doing business" with them. It is indeed true that this was one of the probable, nay perhaps inevitable, consequences of the refusal; but the liability imposed by the section is much more limited than the usual liability for a tort, which extends to any damage that the tortfeasor should reasonably have expected to result from his act. All strikes and "concerted refusals" to work involve some cessation of business; that is the only sanction they can have. When Congress limited the wrong to occasions when the cessation was an "object" of the conduct, it excluded much indeed that the ordinary law of tort would have included. If it had not done so, it would have made nearly all strikes unlawful. The "object" of an action is the concluding state of things that the actor seeks to bring about: that which satisfies his aim. Hence it is a term relative to the whole sequence of steps that he proposes; and it does not apply to those that are only intermediate to it. If I wish to enter my house, but can do so only by passing through my garden, my "object" is to enter the house, and it is not a subsidiary "object" to pass through the garden. On the other hand, if I find the garden gate locked, and I take out my key, the "object" of my doing so is to open the gate, though it is still only a step towards entering the house. So in the case at bar, if the respondents' refusal to serve the trucks was merely to cause a cessation of business between the "Association" and the trucking companies or between those companies and their customers, that may have been within the section, though not even that is perfectly certain as will appear. On the other hand, if the refusal was a part of the struggle for control of the Port, that was the only "object" in the sense that that term is used in the section, unless it is to cover all acts in a labor dispute that are known and intended to result in a cessation of business between others. When therefore the judge left no question to the jury, except whether the strike was a subterfuge for continuing the refusal, it necessarily followed, regardless of whether the refusal was a step or move in the contest for power,

that it was within the section. With that we do not agree for the reasons we have given. It was not within the section unless it affirmatively appeared that the refusal was not part of the struggle; and that did not appear from the fact that it was an act of reprisal. Reprisals are a customary part of all sorts of warfare. Indeed, not only might it be a move in the contest; but it almost inevitably was one, for the "Independent" had no dispute with the trucking companies, or for that matter with the "Association" itself.

We have just said that it is not perfectly certain, even though the "object" of the refusal had been to break up the business of the "Association" or the "customers" with the trucking companies, that the plaintiff would have proved his case. It so happens that in all the three cited decisions the union forced its employer to put a subcontractor off the job; it did not merely refuse to assist the work of the non-union men. We do not say that it should make a difference whether the cessation of business between third parties is brought about without the mediation of one of the parties affected; but we do wish to leave that question undetermined, and that we may for the reasons we have tried to state.

The only remaining question is whether if the respondents' conduct was not a violation of the section, it necessarily follows that it was not in disobedience of the order, because we of course agree that the order had to be obeyed, whether it was right or wrong. In the statement of the "objects" that made the conduct unlawful the order followed the language phrase of subsection (A): that is, the ban was upon forcing an employer "to cease doing business with any other person." It only substituted the names of the "Association," the trucking companies and their "customers"—presumably the shippers. We do not forget the recital that there was "reasonable cause to believe" that the respondents had violated the section; but that left open what meaning the court ascribed to the words that had been lifted without change from the section. "Object" and "doing business" the order did not attempt to define; and, dealing as we are with a criminal prosecution, we must assume that no more was forbidden than the section itself forbade.

It follows from what we have said that the offence was not proved, because the plaintiff did not show that the refusal was not a part of the struggle for power in the Port; as indeed it appears inevitably to have been. We do not say that if it had been shown to have had no connection with that struggle, that is, to have been a mere act of malice not intended to have any effect upon the result, a verdict could not have stood; but the fact was not proved and without that the offence was not proved. Possibly if the cause be tried again it may be proved, but on this record the order must be reversed. There may of course have been criminal incidents accompanying the refusal and the strike; but, if so, their punishment was a matter for the state courts. The losses occasioned to others—the "Association," the trucking companies and their "customers"—by the refusals themselves were, however, incidents for which per se the law in its present form does not furnish any relief. Whether it should do so is of course not for us to say.

Order reversed; new trial ordered if the petitioner so desires.

SWAN, Circuit Judge (dissenting).

In my opinion the judgments should be affirmed.