NATIONAL MARITIME UNION OF
AMERICA, AFL–CIO, Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 18789.

United States Court of Appeals
District of Columbia Circuit.

Argued Dec. 21, 1964.

Decided April 15, 1965.

Petition for Rehearing Denied
May 14, 1965.

Mr. Abraham E. Freedman, Philadelphia, Pa., of the bar of the Supreme Court of Pennsylvania, pro hac vice, by special leave of court, with whom Mr. A. Fred Freedman, Washington, D. C., was on the brief, for petitioner.

Mr. Lawrence M. Joseph, Attorney, National Labor Relations Board, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Asso-

ciate General Counsel, Marcel Mallet-Prevost, Asst. General Counsel, and Stephen B. Goldberg, Attorney, National Labor Relations Board, were on the brief, for respondent.

Before BAZELON, Chief Judge, and FAHY and McGOWAN, Circuit Judges.

McGOWAN, Circuit Judge:

The National Maritime Union of America (NMU) has petitioned to set aside an order of the National Labor Relations Board holding it to be in violation of Section 8(b) (4) (i) (ii) (B) of the Labor-Management Relations Act, 61 Stat. 136 (1947), as amended, 29 U.S.C. § 151 *et seq*. The Board has requested enforcement. We are presented with a somewhat novel set of circumstances in which to define the reach of Congress' purpose to contain within narrow limits the industrial strife which, in the language of the legislative declaration of policy, "interferes with the normal flow of commerce" to the detriment of the public interest. We conclude that what the Board has done here falls within the range of the statutory provisions having that purpose, and we grant enforcement of its order.

I

The S.S. *Maximus,* while owned and operated by the Grace Line, was manned in part by members of the Marine Engineers' Beneficial Association (MEBA). However, upon its sale by Grace to a new owner, Cambridge Carriers, these personnel were replaced by members of NMU with whom Cambridge Carriers had an existing collective bargaining agreement.[1] Shortly after this sale, the *Maximus* was in Philadelphia to load food and drugs for Cuba as part of the ransom of the Bay of Pigs prisoners. This activity was stopped from June 10 until June 20, 1963, when MEBA representatives picketed the ship carrying signs charging Cambridge Carriers with being unfair to the members of that union formerly employed on the *Maximus*. While that ship was so idled, NMU made a retaliatory counter-move. This response took the form of NMU picketing of other ships in Philadelphia, in Houston and Galveston, Texas, and in New Orleans, manned by MEBA members. The order before us relates only to the events in New Orleans;[2] and these events, in turn, relate to two steamship companies.

Delta Steamship Lines Inc., uses the Poydras Street wharf in New Orleans. Bloomfield Steamship Company uses the Cotton Warehouse wharf. Neither has contracts with NMU. Both have contracts with MEBA. On June 17, 1963, NMU started picketing the ships of each, with signs bearing the legend: "Information picketing. MEBA Engineers interfere with employers lawfully recognizing NMU."

In the case of Delta, one of its ships, the S.S. *Del Valle,* was in port at the time the picketing began. The longshoremen ordered by Delta on June 17 and 18 appeared on the dock but would not cross the picket line at the foot of the gangplank. At 1:00 P.M. on June 18, the *Del Valle* was moved away from the wharf to a general anchorage point, and the picketing stopped. Later that afternoon, another Delta ship, the S.S. *Del Mar,* arrived at the wharf. There being

---

1. The employees in question appear to be marine engine-room officer personnel, and the union organizations immediately involved are MEBA and the Brotherhood of Marine Officers, an affiliate of NMU. For convenience in respect of the latter, references throughout are to NMU, which was immediately responsible for the conduct found by the Board to be an unfair labor practice. For its part, MEBA appears to have had an ally in the Seafarers International Union (SIU).

2. Unfair labor charges were filed against NMU in respect of its activities at the other ports. Board orders sustaining those charges were entered in respect of Philadelphia in one case, and Houston and Galveston in another. NMU's petitions to review those orders have been dismissed, and the Board's cross-petitions for enforcement granted, by the Second Circuit. National Maritime Union of America v. NLRB, 2 Cir., 342 F.2d 538, March 5, 1965.

no pickets, the longshoremen ordered by Delta boarded the ship and began unloading it. The next morning the pickets reappeared, and the longshoremen would not cross the line. This same morning the *Del Valle* was brought back to the wharf but the longshore gangs ordered for it similarly observed the line. This continued until the afternoon of the 20th, at which time, the MEBA picketing of the *Maximus* in Philadelphia having ended, the NMU picketing in New Orleans stopped.

Delta meanwhile had, on June 17, concluded that certain repairs needed to be made to the *Del Valle*. The work was awarded to two local companies unaffiliated with Delta. The general manager of one informed Delta, upon finding the picket line, that his men would not cross it. The shop superintendent of the other came to the wharf to take a part away for repair, but would not cross the line to remove the part. Delta's own carpenters and painters in New Orleans, after consultation with their union business agents, refused to come aboard to do their usual work on ships in port.

Bloomfield had one ship, the *Neva West*, at its dock on June 17. As in the case of Delta, carpenters and longshoremen reporting upon order would not cross the picket line.[3] The pipefitter foreman of a local marine repair company, which had received an order from Bloomfield to do some work, upon asking permission of a picket to go aboard to make the repair, was told that he could not do so. On June 18, Bloomfield's vice president in New Orleans called NMU's port agent. The former represented that the *Neva West* required only a few hours

work in order to clear the port, and that the delay was subjecting Bloomfield to losses it could not prevent. The NMU agent refused this request to call off the pickets, as he did a similar and more urgent request the next day. The agent purported to recognize the truth of Bloomfield's pleas that it had no apparent power to solve NMU's problems in Philadelphia, but he told the Bloomfield officer: "We want you to be good and mad. * * * I want you to call Paul Hall [the International President of SIU] and tell him to call off the MEBA pickets on the *Maximus*."

## II

NMU argued to the Board that its picketing was purely informational in character, designed solely to apprise MEBA crew members on the ships in New Orleans of the arbitrary conduct of their brethren in Philadelphia and thereby to generate a grass-roots insistence that this shadow be lifted from the fair name of MEBA. The Board did not believe this claim to be borne out by the facts. Although accepting NMU's protestations that it had no quarrel with either Cambridge Carriers in Philadelphia, or Delta and Bloomfield in New Orleans, the Board found that the purpose of the New Orleans picketing was to close down and prevent all cargo handling and maintenance and repair operations on the ships in question. It found this purpose not only in the peculiar susceptibilities of all waterfront labor to the appearance of a picket line irrespective of what the signs say, but more concretely in the evidence of the particular picketing arrangements and the acts done and statements made by NMU personnel in connection

---

3. An employer known as States Marine Corporation had been retained by Bloomfield to service its ships. States Marine customarily had fork lift operators working on the wharf. The NMU pickets first took up positions at a street intersection leading to the wharf. When the fork lift operators would not cross this picket line to get to their duties on the wharf, their representative suggested to the pickets that perhaps they were at the wrong place. One of the pickets left to

make a telephone call and, upon returning, said: "We are not picketing the docks. We are picketing the ship to keep the longshoremen from going on." Thereupon the picket line was moved to the immediate vicinity of the ship, and the fork lift operators proceeded to their usual duties on the docks. States Marine's orders for carpenters and longshoremen were placed with T. Smith & Company, an independent stevedoring company.

with it. The Board translated these findings into the unfair labor practices banned by Section 8(b) (4) (i) and (ii) (B) of the Act. It considered that its findings established that NMU had fallen afoul of these provisions of the statute by having induced and encouraged individuals employed by Bloomfield, Delta, and the local stevedores and service contractors to refuse to perform work aboard the three ships, and by coercing and restraining those employers, all with the object of forcing or requiring such employers to cease doing business with each others.

The facts as found by the Board appear to us to be supported by substantial evidence in the record; and, indeed, NMU's contentions here are not founded upon any significant challenge to those findings.[4] We are also of the view that those facts fit within the contours of the language used by Congress in Section 8(b) (4) (i) and (ii) (B).[5] NMU argues to us, however, that the mere matching of fact to word does not automatically conclude the matter, and we do not reject that proposition out of hand in the case of this part of the Act. It has been vividly but accurately characterized as "one of the most labyrinthine provisions ever included in a federal labor statute"; and the Supreme Court has admonished that at least one of its component sections cannot be applied literally.[6] NMU suggests three reasons why the Board's order cannot stand: one is couched in jurisdictional terms; the second asserts that a proper construction of the statute excludes the conduct in question from its ban; and the third descries constitutional impediments to be overcome if the first two fail to command acceptance.

### III

NMU first argues that the Board was without jurisdiction to entertain this unfair labor practice complaint because there was no "labor dispute," as that term is defined in Section 2(9) of the Act. But Section 2 is the "Definitions" section of the Act, reflecting a salutary technique of modern legislative drafts-

---

4. NMU argues that the Board assumed the ultimate fact in issue (*i.e.*, NMU's purpose to shut down operations on the ships rather than merely to inform the MEBA crewmen) by reliance upon inadmissible hearsay testimony. The questioned testimony is that of (1) the pipefitter foreman of Dixie Machine Metal and Welding Works, Inc., who related that a picket told him he could not go aboard the *Neva West* to pick up a part for repair, and (2) the representative of the fork lift operators, who said he was told by a picket that the purpose of the picketing was to keep the longshoremen from going aboard the *Neva West*. The crux of the hearsay objection is that, since these pickets were unidentified, they could not be cross-examined. But these were NMU's own pickets, who numbered three and two, respectively, at the times in question, and no reason appears why they could not have been called to deny the statements if they had not in fact been made. Further, these statements were thought by the Board to be in keeping with the responses given by NMU's New Orleans representative to Bloomfield's pleas to remove the pickets; and we agree.

5. Section 8(b) (4) makes it an unfair labor practice for a labor organization:
   "(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, materials, or commodities or to perform any services; or (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where in either case an object thereof is—
   "* * * * * *
   "(B) forcing or requiring any person to cease using, selling, handling, transporting or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person * * *."

6. Aaron, *The Labor-Management Reporting and Disclosure Act of 1959*, 73 HARV.L.REV. 1086, 1113 (1960); Local 761, Int'l Union of Elec., etc. Workers, A.F.L.–CIO v. NLRB, 366 U.S. 667, 672, 81 S.Ct. 1285, 6 L.Ed.2d 592 (1961).

manship whereby words and phrases used elsewhere in the statute in substantive contexts are given precise definition. Section 2 does not purport to define the Board's jurisdiction; and the term "labor dispute," which is defined in paragraph (9), does not appear at all in the part of the statute with which we are presently concerned, that is to say, Section 8(b) (4) (i) and (ii) (B). There are, of course, other sections of the Act in which "labor dispute" is an operative term, but nowhere in the Act is there an overriding declaration that none of its provisions apply unless there is a "labor dispute" as defined in Section 2(9).

The only authority cited by NMU in support of its jurisdictional point is NLRB v. International Longshoremen's Ass'n, 332 F.2d 992 (4th Cir. 1964). There the Board had found an unfair labor practice violative of Section 8(b) (4) (ii) (B) in the refusal of a union to supply men to load a British ship which had been engaged in the Cuban trade. At the time of the Cuban missile crisis in October, 1962, the union adopted a policy of refusing to load ships which had taken part in such trade, and the ship in question, the S.S. *Tulse Hill,* was named on the union's blacklist. Thus, upon the *Tulse Hill's* arrival at Baltimore in January, 1964, the union failed to respond to the request of Maryland Ship Ceiling Company, an independent stevedoring company, for gangs of carpenters to fit the ship for cargo. There was no picketing of the ship nor any other kind of interference with its operations.

The Board's jurisdiction was attacked on the ground, among others, that there was no "labor dispute" as defined in Section 2(9). With one judge dissenting, two members of the court accepted this argument. They appeared to regard the union activity complained of as political in character and, accordingly, as not within the purview of the Act. They justified this construction of the Act by saying that a "labor dispute" as defined in Section 2(9) relates to terms and conditions of employment, which the ideological differences before them did not, and by noting that the Act was passed, in the words of the Supreme Court, "to regulate the conduct of people engaged in labor disputes." Marine Cooks & Stewards, etc. v. Panama S.S. Co., 362 U.S. 365, 372, 80 S.Ct. 779, 784, 4 L.Ed.2d 797 (1960).

The court, however, did not think it the part of prudence to stand upon this finding of a complete lack of jurisdiction in the Board. Noting that it was "dealing with a case of first impression and one likely to be offered for review on certiorari," it thought it appropriate to reach the merits as a hedge against the possibility that the Supreme Court might view the jurisdictional issue differently. And, reaching the merits, it denied enforcement on the ground that the facts as found by the Board did not add up to a violation of Section 8(b) (4) (ii) (B).

We think this decision not to rest upon the jurisdictional issue a highly prudential one. The resolution made of that issue was, as the court explicitly recognized, one of "first impression," and no direct authority could be adduced for it.[7] The quoted phrase of the Supreme Court appears in a Norris-La Guardia Act case, in which the Court was passing on the jurisdiction of a district court to enjoin a strike, not the jurisdiction of the Board to entertain a charge of an unfair labor practice. It is not our function to say whether the Fourth Circuit was right or wrong in its jurisdictional ruling in the *Tulse Hill* case. We note only that the same result in practical effect (namely, the relieving of the union from the burden of the Board's order) was reached on another basis; and we are not per-

---

7. We note in passing that the Second Circuit, in deciding the two cases which are companions to this one, addressed itself to the question of whether a "labor dispute" existed. It concluded, on facts similar to those before us, that the contro- versy giving rise to the Board's orders was such a dispute, as defined by Section 2(9). See National Maritime Union of America v. NLRB, 2 Cir., 342 F.2d 538, March 5, 1965.

suaded by the authority of that case to deny the existence of jurisdiction in this one. As the Fourth Circuit thought it wise to do, so do we move on to NMU's second contention that, even if the Board had jurisdiction, it erroneously appraised NMU's conduct as subject to the strictures of Section 8(b) (4) (i) and (ii) (B) of the Act.

## IV

■ NMU's argument essentially is that Congress in enacting Section 8(b) (4) was addressing itself to the matter of secondary boycotts; that a secondary boycott traditionally and necessarily entails the existence of a dispute with a primary employer; and that, since NMU had no quarrel with Cambridge Carriers in Philadelphia, the *sine qua non* of prohibited secondary activity in New Orleans was missing. It points to many passages in the legislative history where secondary boycotts are unquestionably referred to in this traditional sense.[8] And, as a decisional precedent, it rests upon Douds v. International Longshoremen's Ass'n, 224 F.2d 455 (2nd Cir.), cert. denied, 350 U.S. 873, 76 S.Ct. 117, 100 L.Ed. 772 (1955).[9]

8. NMU directs us only to the legislative history of the Labor Management Reporting and Disclosure Act of 1959, 73 Stat. 519. But the Act's ban on secondary pressures first came into the law in 1947, in the Taft-Hartley Act, 61 Stat. 135 (Labor-Management Relations Act), and it is in the history of this earlier enactment that Congress' purpose must in the first instance be sought. That history suggests that many members of Congress frequently did indeed visualize the objectionable activities in terms of the popularly understood situation: The employees of employer A, with whom they have a dispute, bring pressure on the employees of employer B, a supplier or customer of A, to force B to terminate his dealings with A. See II Leg.Hist. of LMRA 1106 (1947). But the evil Congress sought to eradicate has never been so limited in its manifestations, which no doubt accounts for the breadth of its language. The House Report grouped together "sympathy strikes," "illegal boycotts" and "jurisdictional strikes" as having in common

"the characteristic that they do not arise out of any dispute between an employer and employees who engage in the activities, or, in most cases, between the employer and any of his employees. More often than not the employers are powerless to comply with demands giving rise to the activities, and many times they and their employees as well are the helpless victims of quarrels that do not concern them at all. * * *"

1 Leg.Hist. of LMRA 314 (1947). The object of Section 8(b) (4) was to protect third persons who were "*wholly unconcerned in the disagreement* between an employer and his employees." II Leg. Hist. of LMRA 1106 (1947) (Remarks of Senator Taft). (Emphasis added.) See NLRB v. Denver Bldg. & Constr. Trades Council, 341 U.S. 675, 692, 71 S.Ct. 943, 95 L.Ed. 1284 (1951).

The legislative history of the 1959 amendments reflects this earlier understanding. The bills introduced in both houses were aimed at filling the "major loopholes" in the existing ban on secondary pressure, among them the use of "hot cargo" clauses in labor agreements, the legality of coercion of employers as distinct from their employees, and the failure of the Act, as interpreted, to reach inducement or coercion of individual employees of neutral employers. The amendments were not intended to change, but to reinforce, the 1947 prohibition. See II Leg.Hist. of LMRDA 1568 (1959) (Remarks of Representative Griffin). Congress' purpose, as earlier, was to protect "*genuinely neutral employers* and their employees" (emphasis added) who were not themselves involved in a dispute. And this purpose had the approval even of those members who regarded the final amendments as destructive of the rights of unions. See II Leg. Hist. of LMRDA 1577 (1959) (Analysis of Representatives Thompson and Udall).

9. We cannot help but note NMU's conspicuous lack of interest in the *Tulse Hill* decision as a possible precedent on the merits as distinct from jurisdiction. The reason, we think, is not far to seek. The Board's theory of the Section 8(b) (4) (ii) (B) violation in that case was that the prohibited coercion was directed against Maryland Ship Ceiling Company with the object of preventing or terminating business relations between it and the owners of the *Tulse Hill*. The Fourth Circuit concluded, however, that the only circumstance found to be coercive was the simple withholding by the

■ Although the term "secondary boycott" has been widely used as a convenient short-hand reference to the conduct forbidden by Section 8(b) (4), the phrase nowhere appears in that section or, indeed, anywhere else in the Act. Certain acts, when done for a specified object, are proscribed. The mere fact that the language of this Section comprehends the familiar patterns of a secondary boycott in the customary sense does not inexorably dictate the conclusion that it excludes all variations from those patterns. Where, as here, act and object fall comfortably within the letter of the statute, the Board's hand is to be stayed only upon a persuasive showing that they are beyond its spirit.

■ NMU has not convinced us that they are. The legislative history of so controversial a statute as this tends to be a welter of assertion and counter-assertion from which some comfort may be taken by almost any proponent of a particular construction. We are entitled to interpret Section 8(b) (4) in the light of the Congressional declaration of purpose and policy "to promote the full flow of commerce" and "to define and proscribe practices on the part of labor and management which affect commerce and are inimical to the general welfare." A "central legislative purpose," so we have recently said, was "to confine labor conflicts to the employer in whose labor relations the conflict had arisen, and to wall off the pressures generated by that conflict from unallied employers." [10] The legislative proceedings giving rise to Section 8(b) (4) make clear that Congress wished its proscriptions to be broad enough to realize this purpose.[11]

---

union of its labor. The union had not picketed or struck Maryland Ship or tried to prevent it from obtaining labor elsewhere; it "took no other measures." The court ruled that the Board's order should not be enforced because the "bare refusal to work in the circumstances shown" could not reasonably "be construed as [the] 'threats,' 'coercion,' or 'restraint'" referred to in the Act. But it added this significant comment (332 F.2d at 997):

> "While it might conceivably be an unfair labor practice for the union to institute a general work stoppage against Maryland Ship, no such extreme action has been resorted to here." [Emphasis supplied.]

Thus, on the very facts presented in the case before us, namely, the picketing and related activities designed to prevent anyone from working on the ships, the Fourth Circuit in terms contemplated the possibility that an unfair labor practice could be said to have occurred—and this despite the absence of a dispute between anyone over wages or the other terms and conditions of employment which are the familiar fare of labor-management strife. We think this comment goes far towards explaining NMU's relegation of the *Tulse Hill* case to the background once the jurisdictional bridge has been crossed. And, even if our conjectures on this score are unwarranted, we are left in no doubt by it that the course of conduct challenged in *Tulse Hill* was vastly different from that pursued by NMU here.

10. Miami Newspaper Pressmen's Local No. 46 v. NLRB, 116 U.S.App.D.C. 192, 197, 322 F.2d 405, 410 (1963). This statement was made in the context of our rejection of the claim that Section 8(b) (4) applies only to disturbances of the business relationships between primary and secondary employers. We made clear our reading of the statute as covering the forced suspension of commercial intercourse between secondary employers and other persons. The Supreme Court has characterized the legislative objectives as including the "shielding [of] unoffending employers and others from pressures in controversies not their own." NLRB v. Denver Bldg. & Const. Trades Council, 341 U.S. 675, 692, 71 S.Ct. 943, 95 L.Ed. 1284 (1951).

11. See note 8 *supra*. At one point during the Senate debates Senator Taft, responding to a question from an opponent of the bill, described the aim of the section in this way:

> "All this provision of the bill does is to reverse the effect of the law as to secondary boycotts. It has been set forth that there are good secondary boycotts and bad secondary boycotts. Our committee heard evidence for weeks and *never succeeded in having anyone tell us any difference between different kinds of secondary boycotts. So we have so broadened*

In this framework, Cambridge Carriers is the employer with whom, and Philadelphia the place where, the trouble started. The occasion was the purchase by Cambridge Carriers of a ship which, prior to its sale, had been manned by MEBA personnel. NMU now protests that it cannot be under the ban of the statute because, even if Cambridge Carriers is to be thought of as a "primary employer," NMU, representing its employees, had no quarrel with it and no occasion to put pressure upon it to do other than what it was already doing. The pressures it sought to mobilize in New Orleans, so it is said, were directed solely against MEBA and not the primary employer. There are two answers to this. The first is that Congress clearly desired to protect neutral employers from the ramifying effects of inter-union, as well as union-employer, strife.[12] And the second is that the neutral employer may be hurt just as badly by pressures generated in support of a primary employer as by those directed against him. It is the victim's neutrality which we conceive to be the central element of Congressional concern in this area.[13] Cam-

the provision dealing with secondary boycotts as to make them an unfair labor practice."
II Leg.Hist. LMRA 1106 (1947). (Emphasis supplied.) Compare with this the assessment of 8(b) (4) by that same opponent, Senator Pepper:
"The Committee bill outlaws all kinds of so-called secondary boycotts, even when the objective of the boycott is to preserve wage and working condition gains already achieved by collective bargaining, even if the objective be to solicit in a peaceful way the cooperation of other workers in defending the wage and working standards of a particular community of industry."
II Leg.Hist. LMRA 1108 (1947). (Emphasis supplied.)

12. Two facts emerge quite clearly from the extensive legislative history of the 1947 act. The first is that there was near-unanimous agreement that secondary pressures in aid of inter-union jurisdictional disputes should be prohibited. President Truman in his message to Congress named these among the "certain unjustifiable practices" that the legislation should deal with, and throughout the debates the opponents of 8(b) (4) attacked the provision because it failed to distinguish between these and other assertedly unobjectionable uses of the boycott. See II Leg.Hist. of LMRA 1511, 1108 (1947). The second is that Section 8(b) (4) was generally thought, and intended, to prohibit union use of such pressures. See I Leg.Hist. LMRA 428 (1947) (Senate Report). In the House a proponent of the bill assured the doubters: "H.R. 3020 outlaws the secondary boycott. Under its terms, employers and employees can no longer be caught in the middle between rival and grafting labor unions." I Leg.Hist. of LMRA 658 (1947).

Both the sponsors of the bill and its critics agreed that the effect of 8(b) (4) was to treat jurisdictional strikes and prototypic secondary boycotts alike. II Leg.Hist. of LMRA 1068, 1491 (1947). On this point there was virtually no disagreement.
"Section 8(b) (4) would add to the National Labor Relations Act a new section which would provide that various concerted activities of labor unions, such as secondary boycotts, jurisdictional disputes, and sympathy strikes, defined in broad terms, would be unfair labor practices which could be prohibited. * * *"
II Leg.Hist. of LMRA 1047 (1947) (Remarks of Senator Murray).

13. It is the person "wholly unconcerned" in the primary dispute that the Act is designed to protect. See NLRB v. Business Mach. and Office Appliance Mechanics Conference, etc., 228 F.2d 553 (2d Cir. 1955), cert. denied, 351 U.S. 962, 76 S.Ct. 1025, 100 L.Ed. 1483 (1956); International Bhd. of Elec. Workers, etc. v. NLRB, 181 F.2d 34 (2d Cir. 1950), aff'd 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951). And the pressures from which he is to be protected are those that can be said to be significantly different in kind and intensity from the inconveniences a neutral employer inevitably experiences when someone with whom he is doing business is struck. See Seafarers Int'l Union v. NLRB, 105 U.S. App.D.C. 211, 217, 265 F.2d 585, 591 (1959). Here Delta and Bloomfield operated several hundred miles away from the source of NMU's complaints, and in all probability they would not have been affected by a strike of Cambridge Carriers. The dispute between NMU and SIU and MEBA in no way touched them until NMU began picketing in New Orleans. Moreover, not only were Delta

bridge Carriers, in a sense, voluntarily placed itself in a position where it was exposed to labor strife. Delta and Bloomfield, and the companies with which they did business in New Orleans, were wholly outside the orbit of this conflict. They were neutral, both in terms of their interest in and of their capacity to satisfy NMU's purposes. We believe the Board fairly read Section 8(b) (4) (i) and (ii) (B) as an expression of a Congressional purpose not to permit NMU to force a suspension of business relationships in New Orleans because of its dissatisfaction with a similar suspension which disadvantaged its members and their employer in Philadelphia.[14]

Whatever the meaning of Douds v. International Longshoremen's Ass'n, *supra,* may be, we are not impelled to reach a different result here because of it. It seems to say that if the ultimate objective is not prohibited by statute, an intermediate step in pursuit of that goal is not to be treated as illegal even though the statute, in both letter and spirit, appears to make it so. This is the kind of ratiocination more likely to be encountered in a reversal of criminal contempt convictions, as *Douds* was, than in less dramatic reviews of Board orders, which perhaps accounts for the fact that

the Second Circuit, in the ten years since that decision, apparently had no further occasion to refer to it until very recently. In any event, the Second Circuit has itself now removed this obstacle, at least so far as concerns the set of facts immediately before us. The three judges of that court who granted enforcement of the Board's orders in the two related proceedings that grew out of NMU's picketing in Houston, Galveston, and Philadelphia, see note 2 *supra,* had no difficulty distinguishing *Douds.* In so doing they pointed out that the application of that case argued for there, and here, by NMU was "at odds with" the language of the statute, the authoritative construction of that language by the Supreme Court, and the overwhelming weight of authority in other circuits.[15]

In Amalgamated Meat Cutters, etc. v. NLRB, 99 U.S.App.D.C. 24, 29, 237 F.2d 20, 25 (1956), cert. denied 352 U.S. 1015, 77 S.Ct. 556, 1 L.Ed.2d 545 (1957), we were confronted with this same argument derived from the dichotomy of an assertedly legal ultimate objective, on the one hand, and an intermediate illegal purpose, on the other. In sustaining the Board order under Section 8(b) (4) (A), we said that the legality of the ultimate goal "does not insulate the Union's ac-

---

and Bloomfield "neutral" in theory, but they were incapable in fact of satisfying NMU's demands. Compare Local 5, United Ass'n of Journeymen and Apprentices of the Plumbing and Pipefitting Indus., etc. v. NLRB, 116 U.S.App. D.C. 100, 105, 321 F.2d 366, 371, cert. denied, 375 U.S. 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1963). See generally Lesnick, The Gravamen of the Secondary Boycott, 62 COLUM.L.REV. 1363 (1962).

14. At least two other circuits have taken the position that a dispute with a primary employer is not a prerequisite to the commission of the unfair labor practice forbidden by Section 8(b) (4), and no case that we have found has held that it is. Most recently, in NLRB v. Local Union No. 751, United Bhd. of Carpenters, etc., 285 F.2d 633, 639 (9th Cir. 1960), the Ninth Circuit declared:

"But where the facts otherwise establish a secondary boycott practice violative of section 8(b) (4) (A) *it is*

*immaterial whether the union is engaged in a labor dispute with the primary employer.*" [Emphasis added.]

See also NLRB v. Local 11, United Bhd. of Carpenters, etc., 242 F.2d 932, 935 (6th Cir. 1957); NLRB v. Washington-Oregon Shingle Weavers' Council, 211 F.2d 149, 152 (9th Cir. 1954).

15. See National Maritime Union of America v. NLRB, *supra,* notes 2, 7. The court enumerated several differences, in addition to those we have suggested, that warranted its ignoring its earlier decision. It pointed out that the factual circumstances in *Douds* had all the complexities of the much disputed "situs" cases, that the employees involved were at the time unrepresented and collective bargaining had therefore come to a standstill, and that the activities in dispute all took place within a relatively small area.

tions where the Board finds on sufficient evidence, as here, that such ultimate object is sought by prohibited means. A finding of an illegal intermediate object is all that is required." Thus, even though NMU's ultimate interest here be taken to be the innocent one of protecting its agreements from embarrassments of the kind caused by MEBA's picketing of the *Maximus* in Philadelphia, it could not seek to secure that interest through the illegal intermediate activity of closing down the operations of neutral employers in New Orleans.

## V

NMU's third line of attack on the Board's order derives from the First Amendment. It reiterates NMU's claim before the Board that the only purpose of the picketing was to convey to MEBA crew members the information that their fellows in Philadelphia were engaged in reprehensible conduct. Thus, so goes the argument, if NMU may not effectuate this purpose by appropriate means, such as displaying signs setting forth this information, its constitutional rights of free speech are infringed. The Board, however, upon all the evidence before it, found NMU's purpose to be not simply to inform but to close down all operations by inducing all persons to refrain from crossing the picket line. This finding rested upon substantial evidence beyond that of the mere carrying of the signs as a "signal," and we need not view the case as presenting the free speech issue on that basis alone.

The Supreme Court has been careful to protect the area provided by Congress for peaceful picketing against unconstitutional encroachment. See NLRB v. Fruit and Vegetable Packers, etc., 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964). But conduct, including picketing, that is calculated to produce the

secondary pressures forbidden by Section 8(b) (4) is not protected by the First Amendment. International Bhd. of Elec. Workers, etc., v. NLRB, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951); and see Truck Drivers and Helpers Local 728, etc., v. NLRB, 101 U.S.App.D.C. 420, 249 F.2d 512, (1957), cert. denied, 355 U.S. 958, 78 S.Ct. 543, 2 L.Ed.2d 533 (1958).[16]

The petition is denied; and the Board's request for enforcement is granted.

It is so ordered.

16. NMU made the same argument to the Second Circuit that it makes to us. It found that court no more receptive than are we, for its contention was dismissed with a citation of the Supreme Court's decision in the *Electrical Workers* case

and the following brief statement: "[W]e find that there is no substance to the petitioner's claim that its rights under the First Amendment to the Federal Constitution have been impaired."