**NATIONAL LABOR RELATIONS BOARD**

v.

**WASHINGTON–OREGON    SHINGLE WEAVERS' DIST. COUNCIL et al.**

**No. 13768.**

United States Court of Appeals
Ninth Circuit.

March 8, 1954.

**150**

George J. Bott, General Counsel, David P. Findling, Associate General Counsel, A. Norman Somers, Asst. General Counsel, Bernard Dunau, James A. Ryan, Attorneys, N. L. R. B., Washington, D. C., for petitioner.

Wettrick, Flood & O'Brien, George E. Flood, George O. Toulouse, Jr., Seattle, Wash., Francis X. Ward, Indianapolis, Ind., for respondent.

Before DENMAN, Chief Judge, and HEALY and POPE, Circuit Judges.

DENMAN, Chief Judge.

The National Labor Relations Board, hereafter the Board, petitions for enforcement of its order requiring the Washington-Oregon Shingle Weavers' District Council and Everett Local 2580 Shingle Weavers' Union (hereafter the Union) to cease and desist from inducing or encouraging its members to engage in a secondary boycott.[1]

The main issue presented by this petition is whether a union violates Section 8(b) (4) (A) of the Labor Management Relations Act, 29 U.S.C.A. § 141 et seq. (hereafter the Act) when it refuses to allow its employees to work in an employer's plant solely because the employer is using non-union products. Subsidiary to this main issue are the following questions: (1) whether the trial examiner erred in rejecting an offer of proof by the Union; (2) whether the trial examiner erred in admitting certain exhibits; and (3) if either or both (1) and (2) be answered in the affirmative, whether the error is such as to require a denial of enforcement.

The complainant, the Sound Shingle Company (hereafter the Company) is a partnership consisting of John E. Martin and Frank S. Barker, and is a manufacturer and processor of shingles. In the latter part of January, 1951, Paul M. Sarrett, a field representative of the Union, called on John E. Martin, a Company partner, and told him that the plant would be closed if it used Canadian shingles.

On January 11, 1952, the Company received a carload of shingles from the North Shore Shingle Co., a Canadian corporation, with which it had a contract to process shingles into shakes. When the car was opened a union shop steward observed that the shingles bore no union label and remarked: "They are B. C. [British Columbia] shingles and we won't do nothing with them. We will let them sit there." Thereupon, all employees left the plant.

At a subsequent conference, representatives of the Union told Martin that he could not use Canadian shingles because they were unfair, that they (the Union) had been working on the Canadian mills for some time. When pressed by Martin, one of the Union representatives flatly stated: "Well, O. K. For the record let us have it that way. We absolutely won't allow your boys to work on Canadian shingles."[2]

The Board found that the Union had induced and encouraged the Company's

---

1. The Board's order also required that the customary notices be posted.

2. This statement was also reported as follows: "Well for the record we called the boys off. We are absolutely not going to let them run on Canadian shingles."

employees to refuse to work on Canadian shingles, an object thereof being to cause the Company to cease using or otherwise dealing in the products of the North Shore Shingle Company and other Canadian manufacturers, in violation of Section 8(b) (4) (A).

(A). *Rejection of Union Evidence:*

The Union offered evidence and made an offer of proof, both rejected, tending to show that Martin had had trouble with the Union over the use of Canadian shingles in the plant of another company with which he was connected and tending to show that the Union had a long standing policy regarding the protection of its union label. The Union sought to establish as a defense that its aim in inducing the employees' actions was protection of the union label. They argue that had they established these facts, the strike would have been shown to be a concerted activity for the "mutual aid or protection" of the employees and hence a protected activity under Section 7 of the Act.

█ █ The union label is registered as a trademark. The Union was entitled to protest its unlawful use and even to enjoin a threatened unlawful use.[3] But if an act by a union is an unlawful secondary boycott, the mere fact that it was designed to proscribe an unauthorized use of a union label will not make the action privileged. While the object of the union in such a case would be lawful, the means chosen to achieve that end would be contrary to Section 8(b) (4) (A) of the Act and hence not protected under Section 7 thereof. See N. L. R. B. v. Wine, Liquor & Distillery Workers Union, 2 Cir., 178 F.2d 584, 586, 16 A.L.R.2d 762. It is thus clear that the offer of proof and the evidence in support thereof, even if established, would not have constituted a defense to the charges made.

(B) *Admission of Exhibits:*

The trial examiner received in evidence, over objections duly preserved before the Board, articles from the "Shingle Weaver," a Union publication. These articles dealt with the Union's drive to prevent the use of non-union shingles in the United States and in general tone exhorted Union members to insist that any shingles that they work bear a union label. Particular emphasis was placed on Canadian shingles as unfair in these articles. These articles contained no threat of reprisal or promise of benefit to the employees. The Union argues that according to the plain terms of Section 8(c) of the Act, these articles can "not constitute or be evidence of an unfair labor practice".

█ We need not consider here whether the admission of these exhibits was erroneous, for if so, the error is not sufficient to require us to deny enforcement of the Board's order. The Board did not rely upon these exhibits as direct evidence of the unlawful practice, but merely as evidence showing Union policy with regard to non-union products. There is abundant and compelling evidence to support the findings of the Board apart from these exhibits. See N. L. R. B. v. Anderson, 9 Cir., 206 F.2d 409, certiorari denied 346 U.S. 938, 74 S.Ct. 377, 98 L.Ed. ——; N. L. R. B. v. Howell Chevrolet Co., 9 Cir., 204 F.2d 79, 84, affirmed 346 U.S. 482, 74 S.Ct. 214.

(C) *The Merits:*

The Union argues that even if the findings of fact of the Board are accepted, the Board erred, as a matter of law, in concluding that the Union's activity constituted an unlawful secondary boycott. It argues that inasmuch as the only dispute was between the Union and the Company, there could be no secondary boycott under the Act.

Section 8(b) (4) (A) of the Act proscribes a strike for the purpose of compelling an employer to cease using the products of another producer, processor or manufacturer.[4] The evidence clearly

---

3. See § 34 of the Act of July 5, 1946, 15 U.S.C.A. § 1116.

4. § 8(b) (4) (A) reads in part as follows:
  "Sec. 8 * * *

establishes that this was a strike of such character. There is no evidence that the work stoppage at the Company's plant was designed for any purpose other than to compel the Company to cease using unfair shingles produced by another.

■■■■ The Union's argument that there was no evidence of a dispute between it and the Canadian plants is without merit. If that were true, it would not make the Union's conduct any more excusable. The prohibited object of the boycott is stated by the statute to be "forcing * * * any employer or other person to cease using * * * the products of any other producer, processor, or manufacturer * * *." That is a prohibited object whether the union has or has not a dispute with such "other producer, processor, or manufacturer". In fact, if the object is sought, not because of any dispute, but merely because the union dislikes the other producer for any reason, or for no reason, the conduct would appear even more reprehensible. The record contains evidence of several statements of Union representatives, made directly to Company representatives, to the effect that the Canadian plants were unfair and that "we have been working on them." The only dispute between the Union and the Company was over the latter's use of unfair shingles, and had no bearing on wages, working conditions, etc. In such a case, a strike called by the Union can have no other purpose than to compel the Company to cease using what the Union considers unfair shingles.

Furthermore, the legislative history of the Act clearly shows that Congress intended to proscribe exactly the type of union action involved here. Particularly impressive is the language used by Sena-

tor Taft in condemning this type of strike in debate on the floor of the Senate.

"Take a case in which the employer is getting along perfectly with his employees. They agree on wages. Wages and working conditions are satisfactory to both sides. Someone else says to those employees, 'We want you to strike against your employer because he happens to be handling some product which we do not like. We do not think it is made under proper conditions.' Of course if that sort of thing is encouraged there will be hundreds and thousands of strikes in the United States. There is no reason that I can see why we should make it lawful for persons to incite workers to strike when they are perfectly satisfied with their conditions. If their conditions are not satisfactory, then it is perfectly lawful to encourage them to strike. The Senator [Pepper] says they must be encouraged to strike because their employer happens to be doing business with someone the union does not like or with whom it is having trouble or having a strike. On that basis there can be a chain reaction that will tie up the entire United States in a series of sympathetic strikes, if we choose to call them that." 93 Cong. Rec. 4198, in 2 Leg.Hist.L.M.R.A. 1107.

Also, in House Conference Report No. 510 on H.R. 3020 [the Act], the following statement is made with regard to this section:

"Under clause (A) strikes or boycotts, or attempts to induce or encourage such action, were made un-

---

"(b) it shall be an unfair labor practice for a labor organization or its agents——

*     *     *     *     *

"(4) to engage in, or to induce or encourage the employees of any employer to engage in, a strike or a concerted refusal in the course of their employment to use, manufacture, process, transport, or otherwise handle or work on any

goods, articles, materials, or commodities or to perform any services, where an object thereof is: (A) forcing * * * any employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person * * *."

fair labor practices if the purpose was to force an employer or other person to cease using, selling, handling, transporting, or otherwise dealing in the products of another, or to cease doing business with any other person. *Thus it was made an unfair labor practice for a union to engage in a strike against employer A for the purpose of forcing that employer to cease doing business with employer B.* Similarly it would not be lawful for a union to boycott employer A because employer A uses or otherwise deals in the goods of, or does business with, employer B." (Emphasis supplied.) 1 Leg. Hist., L.M.R.A. 505, 507.

Substantially the same statement was made in Senate Report No. 105 on S. 1126 [the Senate Bill], see 1 Leg.Hist. L.M.R.A. 407, 428. Here the union engaged in a strike against the Company ("employer A") for the purpose of forcing that employer to cease doing business with the North Shore Shingle Co. ("employer B"), a conduct clearly prohibited by Section 8(b) (4) (A).

 The Union contends that by virtue of an agreement existing between it and the Company, the latter had bound itself not to work on any shingles not bearing the Union label. The Union argues that an employer may bind himself not to handle unfair goods and if he does so, a strike to enforce such an agreement is not a violation of Section 8(b) (4) (A). Assuming without deciding that this is a proper statement of the law,[5] it is not controlling here because there is no such agreement.

In seeking such an agreement in the record, the Union points to Article VI of the 1950 labor agreement between it and the Company,[6] and to the fact that Martin had been warned that if the plant used unfair shingles it would be closed and that Martin, knowing this, entered into the bargaining agreement. This evidence does not amount to a clear showing of the agreement contended for, and if such an agreement existed, it would be a waiver of the employer's statutory protection against secondary boycott. The Board has long recognized that where such agreements are permissible, they will not be implied "in the absence of a clear and unmistakable showing of a waiver of such rights." See Tide Water Associated Oil Co., 85 N.L.R.B. 1096, 1098, and cases cited. We think this the correct principle of law to be applied.

The order of the Board is ordered enforced.

---

5. See Rabouin v. N. L. R. B., 2 Cir., 195 F.2d 906, 912.

6. Article VI reads as follows, insofar as here material:

"(c) All shingles and by-products produced fair shall not be declared unfair providing the plant does not attempt to operate unfair with fair stock on hand."