**ROYWOOD CORPORATION, Plaintiff,**

**v.**

**RADIO BROADCAST TECHNICIANS LOCAL UNION NO. 1264 OF the INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, an unincorporated association, Defendant.**

**Civ. A. No. 4647–67.**

United States District Court
S. D. Alabama, S. D.
July 16, 1968.

---

Willis C. Darby, Jr., Kilborn, Darby & Kilborn, Thomas E. Twitty, Sr., Inge, Twitty, Duffy & Prince, Mobile, Ala., for plaintiff.

Albert M. Horn, Horn & Zell, Atlanta, Ga., James Wood, Simon & Wood, Mobile, Ala., for defendant.

## OPINION

DANIEL HOLCOMBE THOMAS, District Judge.

Roywood Corporation (Roywood) brought this action against Radio Broadcast Technicians Local Union No. 1264 of the International Brotherhood of Electrical Workers, AFL-CIO, (Local 1264) to enforce a liability created by Title 29 Section 187 for an alleged secondary boycott. The only question presented at this time is whether the de-advertising campaign of Local 1264 directed against Roywood and its advertisers is a secondary boycott proscribed by Section 8(b) (4) of the National Labor Relations Act, as amended, 29 U.S.C.A. § 158(b) (4). Damages, if any, sustained by Roywood are to be determined in further proceedings in this cause.

Roywood and Local 1264 were parties to a collective bargaining agreement which was terminated effective January 31, 1966, by Local 1264 giving notice of termination pursuant to the terms of the contract on November 2, 1965.

Subsequent to November 2, 1965, representatives of Local 1264 and Roywood met and exchanged contract proposals and reached tentative agreements on numerous provisions of a new contract. On February 1, 1966, Roywood submitted Local 1264 a "package proposal" which, among other things, provided for an immediate $10.00 per week wage increase to $135.00 per week and three additional $5.00 per week wage increases effective in 1968, 1969 and 1970, for a total increase of $25.00 per week in the aggre-gate over five years; up to three weeks vacation pay; two consecutive days off each week; 30 days sick leave each year with full pay; no split shifts; six paid holidays each year; a guarantee of 40 hours pay each week; up to five days leave with full pay in the event of a death in the immediate family; payment of one-half of the premiums for Blue Cross-Blue Shield Hospital insurance; $5,000.00 company paid life insurance policy; and, a guarantee of 52 full weeks pay each year for the full five year term of the proposed contract for every engineer employed by Roywood when the proposed contract was executed. This "package proposal" was accompanied by a letter which offered "to extend our present agreement up to a period of two weeks."

On February 2, 1966, without having given any notice to Roywood, all of the engineers represented by Local 1264 failed to report to work and went on strike. Local 1264 immediately commenced picketing Roywood's studio on Government Street with signs bearing the inscription: "WALA–TV Technicians On Strike Local 1264 IBEW AFL-CIO". The International Brotherhood of Electrical Workers did not sanction Local 1264's strike. Wages were not an issue in the strike. Wages offered by Roywood were higher than wages paid by any union radio station in the Mobile, Alabama, area and equal to the wages paid by WKRG-TV, the only other union television station in the broadcast area of WALA-TV.

Representatives of Roywood and Local 1264 met periodically to discuss the terms of a new contract; the last bargaining session was held on February 13, 1967.

Within two weeks after the strike began, Local 1264 commenced a systematic de-advertising campaign against Roywood. J. C. Burns, President of Local 1264, and the chief engineer at radio station WUNI, Mobile, Alabama, was in charge of Local 1264's de-advertising campaign.

Local 1264 ascertained the names of WALA-TV's advertisers by monitoring WALA-TV. An employee and the chief engineer of radio station WUNI monitored WALA-TV while they were on duty at WUNI. Local 1264 obtained the names of prospective advertisers from the telephone directory and from newspapers. Local 1264 contacted advertisers and prospective advertisers in person, by telephone and by letter and requested that advertisers "respect our picket line at WALA-TV and place your advertising with ONLY UNION STATIONS in this area."

Local 1264 picketed adjacent to and across the street from many local advertisers that did not heed Local 1264's "request". The inscription on a typical advertiser picket sign was:

BULLARD OLDS.
IGNORES
PICKET
LINES
at WALA–TV
PLEASE DO NOT PURCHASE PRODUCTS
SOLD IN THIS STORE WHICH
ARE ADVERTISED OVER WALA–TV
IBEW LOCAL 1264 AFL–CIO

———◆———

Local 1264 distributed handbills at the entrances of establishments that advertised on WALA-TV. On some occasions, Local 1264 handbilled and picketed an establishment simultaneously. A typical handbill carried this message:

QUALITY
RAMBLER
IGNORES
PICKET LINES
AT
WALA–TV
PLEASE DO NOT PURCHASE
PRODUCTS SOLD IN THIS
STORE WHICH ARE ADVER-
TISED OVER WALA–TV.
IBEW, LOCAL 1264, AFL–CIO

———◆———

Local 1264 distributed unfair lists at shopping centers and at various other places in and about Mobile. A typical unfair list stated:

"ATTENTION"
Fellow Trade Unionist
The following merchants listed below, COMPLETELY IGNORE AFL–CIO PICKET LINES at WALA–TV. (Channel 10)
(Names of several firms and products)
The entire WALA–TV technical staff has been out on strike since February 2, 1966 * * * The station is now being operated by imported strike breakers * * * Can you SEE the difference * * *?

IBEW, Local 1264
AFL–CIO
Phone 433–9962

Local 1264 caused 8½ x 13¼ placards and 14 x 22½ placards to be printed for use in connection with its de-advertising campaign. The placards contained identical wording:

(Name of Product, Service or Advertiser)
IGNORES
PICKET LINES
of Local 1264, IBEW, AFL–CIO
And Continues to Advertise Over the
STRUCK FACILITIES
of WALA–TV, Mobile, Alabama
DETACH AND MAIL THIS CARD TO ADVERTISER CROSSING OUR PICKET LINE

———◆———

A postal card attached to the placard and addressed to the advertiser bore this inscription:

THE PLACARD FROM WHICH THIS POSTAL CARD WAS DETACHED WAS POSTED IN OUR UNION HALL THIS DAY. IT WILL REMAIN POSTED UNTIL WE ARE INSTRUCTED BY LOCAL 1264 OF MOBILE TO REMOVE SAME.

———◆———

along with places for the name and address of the posting union. The following instruction also appeared on an attachment to the placard: "PLEASE POST IN A CONSPICUOUS PLACE". The postal cards on the two placards were identical in size.

Local 1264 inserted the name of a product, service or advertiser in the space provided on a large placard and mailed the placard to the advertiser. Local 1264 inserted the name of a product, service or advertiser on small placards, addressed the postal card attached to the small placard to the advertiser and forwarded small placards to various unions throughout the United States with instructions for the unions to mail the pre-addressed postal cards to the advertiser. The advertiser subsequently received postal cards announcing that the placard displaying the advertiser's name or the name of the advertiser's product or service was posted in particular union halls.

Pursuant to a petition for an election filed by Roywood, the National Labor Relations Board directed, and on May 19, 1967, held an election among "all engineering department employees" of television station WALA-TV to determine if Roywood's engineering department employees desired to be represented by Local 1264 for the purpose of collective bargaining. All eligible voters voted against representation by Local 1264.

Prior to the election, Local 1264 decided to change the wording on the picket sign at WALA-TV's studio after the election and to continue its de-advertising campaign against Roywood and its advertisers. Local 1264 ceased picketing Roywood's studio with an "on strike"

picket sign on May 22, 1967. After about a week, Local 1264 resumed picketing Roywood's studio with a sign bearing the following inscription:

WALA–TV
NON-UNION
THIS SIGN IS NOT DIRECTED TO THE EMPLOYEES OF WALA–TV or THE EMPLOYEES OF ANY OTHER EMPLOYER DOING BUSINESS WITH WALA–TV.
IS DIRECTED SOLELY TO THE PUBLIC.
I.B.E.W. LOCAL 1264 AFL–CIO

Local 1264 continued to refer to its strike against Roywood and Local 1264's grievances in its letters to advertisers and to unions and in articles prepared by Local 1264 for newspaper publication.

Placards mailed to advertisers and to unions after the election carried the inscription:

(Name of Product, Service or Advertiser)
IGNORES
PICKET LINES
ESTABLISHED AT
WALA–TV
MOBILE, ALABAMA
BY LOCAL 1264, IBEW, AFL–CIO
DETACH THIS CARD AND MAIL TO ADDRESSEE

No change was made in the postal card. None of the "struck facilities" placards were recalled after the election. A "do not patronize list" published in the Labor Union News after the election did not identify the primary employer, Roywood, but only named the advertisers.

When the placard campaign against an advertiser was not successful, Local 1264 sought to bring pressure on the advertiser's distributors who were located outside of the broadcast area of WALA–TV. On August 7, 1967, J. L. Elkins, Vice President of Local 1264 and an employee of WKRG-TV, Mobile, Alabama, wrote to Carter Distributing Company of Chattanooga, Tennessee, a distributor of Miller's beer:

> The Miller Brewing Company of Milwaukee has refused to respond to repeated pleas from this union to respect its picket lines at WALA–TV (Mobile) and continues to persist in advertising over this NON-UNION facility. Miller and Schlitz are the only two brewers now refusing to honor our picket lines at this station.

> For your information I am enclosing a copy of a poster which we will be mailing to unions in the Chattanooga area within the very near future. We felt that since your firm is the distributor in that area you should be made aware of this and of the hardfast position that Miller has taken in this matter.

On October 12, 1967, Roywood filed an unfair labor practice charge against Local 1264 with the Regional Director of the National Labor Relations Board in New Orleans, charging Local 1264 with violations of Section 8(b) (4) of the National Labor Relations Act, 29 U.S.C.A. § 158(b) (4). By a Settlement Agreement between Local 1264 and the Regional Director effective December 12,

1967, Local 1264, without admitting that it had engaged in any violation of the Act, agreed to post and to abide by a notice which in part provided:

WE WILL NOT in any manner or by any means, including picketing, orders, directions, or appeals, however given, made, or imparted, or by any like or related acts or conduct, or by permitting any such to remain in existence or effect, threaten, coerce, or restrain MOBILE DODGE, GULF COAST MOTORS, CURT HINOTE CHRYSLER PLYMOUTH, JOE BULLARD OLDSMOBILE, U. J. CHEVROLET, GRADY BUICK COMPANY, FACT-O-BAKE, BELLAS HESS, THOMPSON CHRYSLER-PLYMOUTH, GREER'S, GAYLORD'S, PATE WHITE, BOLTON FORD, TREADWELL FORD, COLONEL DIXIE, PAK-A-SAK, BALDWINS FURNITURE, PHILLIPS SHOES, ALMYRS, SPRINGDALE PHOTO, GRANTS DEPARTMENT STORE, or any other person engaged in commerce, or in an industry affecting commerce, where the object thereof is to force or require any of the aforementioned persons or any other person to cease placing advertising or otherwise doing business with ROYWOOD CORPORATION (TELEVISION STATION WALA-TV) or forcing or requiring ROYWOOD CORPORATION (TELEVISION STATION WALA-TV) to recognize or bargain with RADIO BROADCAST TECHNICIANS LOCAL UNION NO. 1264 of the INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL-CIO, as the representative of its employees unless such labor organization has been certified as the representative of such employees under the provisions of Section 9 of the Act.

Local 1264 ceased picketing Roywood's studio and advertisers and ceased handbilling in the immediate vicinity of advertisers' establishments after the execution of the Settlement Agreement.

After Local 1264 executed the Settlement Agreement, Local 1264 wrote to all WALA-TV advertisers stating that Roywood had " 'forced' its technicians out on strike", that "to comply with the request of the National Labor Relations Board, Local 1264 has now withdrawn *all picket lines*," and concluded:

To protect the stations with which we have contracts from unfair competition, we are intensifying our boycott of products advertised on station WALA-TV and we are urging all of organized labor to refrain from purchasing those products. We, therefore, respectfully request your company refrain from advertising with WALA-TV's NON-UNION operation, and that you place your business with union stations in this area.

Subsequent to the Settlement Agreement, Local 1264 distributed a handbill at several shopping centers and at other locations in and about Mobile, Alabama which stated:

MOBILE DODGE
Is
Completely Aware
Of The
UNION BUSTING
Tactics
Employed By
WALA–TV
Please Do Not Purchase
Products Sold In This
Store Which Are Advertised Over WALA–TV
IBEW, LOCAL 1264, AFL–CIO

Subsequent to entering into the Settlement Agreement with the Regional Director, Local 1264 changed the wording on its placards, to read:

> (Name of Product or Name of Advertiser)
> IGNORES PLEA
> OF LOCAL 1264, IBEW, AFL–CIO
> AND
> CONTINUES TO ADVERTISE OVER
> NON-UNION FACILITIES
> OF
> WALA–TV
> MOBILE, ALABAMA
> DETACH THIS CARD AND MAIL TO ADDRESSEE

At the time of the trial, Local 1264 had commenced using still another placard, namely:

> DON'T BUY
> (Name of Product or Name of Advertiser)
> FELLOW UNION MEMBERS!
> PLEASE HELP US MAINTAIN UNION
> WORKING CONDITIONS . . . THE ABOVE
> PRODUCT IS ADVERTISED OVER—
> NON-UNION FACILITIES
> OF
> WALA–TV
> MOBILE, ALABAMA
> LOCAL 1264, IBEW, AFL–CIO
> DETACH THIS CARD AND MAIL TO ADDRESSEE

Throughout its de-advertising campaign Local 1264 has continued to send large placards to advertisers and small placards to local unions. It is impossible to ascertain whether a postal card came from a "struck facilities", "picket lines", "non-union facilities", or "don't buy" placard or the size of the placard from which the postal card was detached.

Local 1264's campaign was not without success. According to H. D. Smith, Business Manager of Local 1264:

We have mailed thousands of posters to Unions all over the United States. The Unions have been very cooperative, and have forwarded the detachable cards to advertisers. Publicity about the strike is helpful to us. Many national advertisers paid little attention to appeals from us, but when they received correspondence from Unions all over the country, the situation started to change.

Section 8(b) (4) (B) of the National Labor Relations Act provides in relevant part:

It shall be an unfair labor practice for a labor organization or its agents—

\*   \*   \*   \*   \*   \*

(i) to engage in, or to induce or encourage any individual employed by any person engaged in commerce or in an industry affecting commerce to engage in, a strike or a refusal in the course of his employment to use, manufacture, process, transport, or otherwise handle or work on any goods, articles, mater-

ials, or commodities or to perform any services; or

(ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce,

where in either case an object thereof is—

\* \* \* \* \* \*

forcing or requiring any person to cease using, selling, handling, transporting, or otherwise dealing in the products of any other producer, processor, or manufacturer, or to cease doing business with any other person, or

forcing or requiring any other employer to recognize or bargain with a labor organization as the representative of his employees unless such labor organization has been certified as the representative of such employees under the provisions of section 9 of this title:

*Provided,* That nothing contained in this clause (B) shall be construed to make unlawful, where not otherwise unlawful, any primary strike or primary picketing;

\* \* \* \* \* \*

*Provided further,* That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer, as long as such publicity does not have an effect of inducing any individual employed by any person other than the primary employer in the course of his employment to refuse to pick up, deliver, or transport any goods, or not to perform any services, at the establishment of the employer engaged in such distribution.

Properly construed, Section 8(b) (4) (B) does not interfere with the ordinary strike; the "core concept" of a secondary boycott is "union pressure directed at a neutral employer the object of which was to induce or coerce him to cease doing business with an employer with whom the union was engaged in a labor dispute." National Woodwork Manufacturers Ass'n v. National Labor Relations Board, 386 U.S. 612, 87 S.Ct. 1250, 1256, 18 L.Ed.2d 357, 366. "The gravamen of a secondary boycott is that its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it. Its aim is to compel him to stop business with the employer in the hope that this will induce the employer to give in to his employees' demands." International Brotherhood of Electrical Workers, etc. v. National Labor Relations Board, 2 Cir., 1950, 181 F.2d 34, 37, affirmed 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299. Section 8(b) (4) "seeks to avoid the implication of employers in disputes not their own where an object of the union conduct is to force the cessation of business relations between such neutral employers and any other person." National Labor Relations Board v. United Association of Journeymen and Apprentices of the Plumbing, etc., 1st Cir., 1963, 320 F.2d 250, 253.

■ The decisions of the National Labor Relations Board and of the Supreme Court establish that Section 8(b) (4) sought to reconcile the "dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in *primary labor disputes* and of shielding unoffending employers and others from pressures in controversies not their own." (Emphasis supplied.) National Labor Relations Board v. Denver Building and Construction Trades Council, 341 U.S. 675, 692, 71 S.Ct. 943, 953, 95 L.Ed. 1284, 1297; Local 761, International Union of Electrical, Radio and Machine Workers, AFL-CIO v. National Labor Relations Board, 366 U.S. 667, 673, 81 S.Ct. 1285, 6 L.Ed.2d 592, 597; United Steelworkers of America, AFL-CIO v. National Labor Relations Board, 376 U.S.

492, 496, 84 S.Ct. 899, 11 L.Ed.2d 863, 866; National Woodwork Manufacturers Ass'n v. National Labor Relations Board, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357, 368.

■ "The existence of a lawful primary dispute is not required as a necessary element in finding a violation of Section 8(b) (4)." Millmen & Cabinet Makers Union, Local No. 550, Etc. (Steiner Lumber Company), 153 N.L.R.B. 1285, 1289, affirmed National Labor Relations Board v. Millmen & Cabinet Makers Union, Local No. 550, etc., 9 Cir., 1966, 367 F.2d 953; National Maritime Union of America, AFL-CIO v. National Labor Relations Board, 1965, 120 U.S.App.D.C. 299, 346 F.2d 411, 419, cert. den. 382 U.S. 840, 86 S.Ct. 90, 15 L.Ed.2d 82, reh. den. 382 U.S. 933, 86 S.Ct. 312, 15 L.Ed.2d 346. Indeed, the secondary boycott is "more reprehensible if there is no legitimate primary dispute with the primary employer." Millmen & Cabinet Makers Union, Local No. 550, Etc. (Steiner Lumber Company), 153 N.L.R.B. 1285, 1289, affirmed National Labor Relations Board v. Millmen & Cabinet Makers Union, Local No. 550, etc., 9 Cir., 1966, 367 F.2d 953; National Labor Relations Board v. Washington-Oregon Shingle Weavers' Dist. Council, et al, 9 Cir., 1954, 211 F.2d 149, 152.

■■ "The crucial question" in every secondary boycott case "is always to determine the object of the labor activity." National Labor Relations Board v. Northern California District Council of Hod Carriers, etc., 9 Cir., 1968, 389 F.2d 721, 725. "The question of objectives in every case is one of fact and not of assumptions or presumptions." Local 741, United Assn. of Journeymen, etc. (Keith Riggs Plumbing and Heating Contractor), 137 N.L.R.B. 1125, 1126. The court is not bound by "self-serving language on a picket sign or statements of union officials. It looks to all the facts and circumstances in drawing a reasonable inference as to the object." Warehouse & Mail Order Employees, Local 743 (Aetna Plywood and Veneer Company), 140 N.L.R.B. 707, 709–10; Truck Drivers Local 649 (Cold Spring Construction Co.), 162 N.L.R.B. No. 152, 64 L.R.R.M. 1216, 1217. "What in actuality is * * * veiled coercion of the secondary employer, cannot by the simple use of the words 'consumer directed', be given statutory protection." National Labor Relations Board v. Millmen & Cabinet Makers Union, Local No. 550, etc., 9 Cir., 1966, 367 F.2d 953, 956.

Local 1264 contends (a) that "its deadvertising activities did not threaten, coerce or restrain secondary employers" within the meaning of Section 8(b) (4) of the Act; (b) that Local 1264's activities were permissible under the second proviso to Section 8(b) (4) in that its activities were "for the purpose of truthfully advising the public, including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has a primary dispute and are distributed by another employer;" (c) that its activities were free speech protected by the First Amendment to the Constitution of the United States; and (d) that its activities are protected by Section 8 (c) of the Act which provides:

The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this Act, if such expression contains no threat of reprisal or force or promise of benefit.

■ Displaying of picket signs adjacent to and across the street from advertisers' places of business, distribution of handbills at the entrances to advertisers' places of business, in shopping centers and at various other places, the distribution of unfair lists in shopping centers and the publication of unfair lists in newspapers were all part of a campaign calculated to bring economic pressure upon the producers and distributors of products advertised over WALA-TV. Economic retaliation in the

form of loss of business is the most potent form of restraint and coercion, other than actual and threatened violence. Each such activity clearly constitutes threats, restraint and coercion within the meaning of Section 8(b) (4) (ii) of the Act. American Federation of Television and Radio Artists (Great Western Broadcasting Corporation), 150 N.L.R.B. 467, 471, affirmed Great Western Broadcasting Corporation v. National Labor Relations Board, 9 Cir., 1966, 356 F.2d 434, cert. den. 384 U.S. 1002, 86 S.Ct. 1924, 16 L.Ed.2d 1015; Honolulu Typographical Union No. 37, AFL-CIO (Hawaii Press Newspapers, Inc.), 167 N.L.R.B. No. 150, 66 L.R.R.M. 1194; National Labor Relations Board v. Building Service Employees International Union, 10 Cir., 1966, 367 F.2d 227; United Brotherhood of Carpenters and Joiners of America v. Sperry, 10 Cir., 1948, 170 F.2d 863; National Labor Relations Board v. United Brotherhood of Carpenters and Joiners of America, 10 Cir., 1950, 184 F.2d 60, cert. den. 341 U.S. 947, 71 S.Ct. 1011, 95 L.Ed. 1371.

■ The object of Local 1264's picketing and de-advertising campaign prior to the election is clearly established by the picket signs, handbills, unfair lists, placards and communications to advertisers, all of which proclaimed that Local 1264 was on strike. "A strike, in itself, is a device for bringing an employer to terms on some kind of demand for the settlement of differences. It carries with it implicitly a claim of right to effect such a settlement." Lumber and Sawmill Workers Local Union No. 2797 (Stoltze Land & Lumber Company), 156 N.L.R.B. 388, 392. Local 1264 does not dispute that its pre-election activity was to force Roywood to recognize and bargain with Local 1264. Local 1264 contends that after the election, its objective changed, that it no longer sought recognition or bargaining, that it had no dispute with Roywood, but the objective of its picketing and de-advertising campaign, after the election, was as enunciated by its President, Burns, "to try to encourage

advertisers not to place their business with WALA-TV and place it with union stations friendly to organized labor." Local 1264's failure to name the union stations creates a strong inference that this was not Local 1264's object. Again according to Burns, "We are in hopes that the situation which has developed at WALA will not spread any further. I feel like it has already helped us. We lived through a contract at WKRG this year without having it cancelled." The court cannot accept Local 1264's contention that Local 1264 abandoned its object of forcing Roywood to recognize and bargain with Local 1264 by coercing Roywood's advertisers. Local 1264's decision reached prior to the election to change the wording on the picket signs and placards after the election, as well as Local 1264's continued reference to the "strike" and to Local 1264's grievances, real or imaginary, against Roywood in Local 1264's communications and newspaper articles after the election establish that the primary object of all of Local 1264's activity after the election remained the same; that is, to force and require Roywood to recognize and bargain with Local 1264 as the representative of the engineering department employees of Roywood. Lumber and Sawmill Workers Local Union No. 2797 (Stoltze Land & Lumber Company), 156 N.L.R.B. 388, 392, 393; Retail Store Employees' Union (Irvins, Inc.), 134 N.L.R.B. 686, 699; National Labor Relations Board v. Local 182, International Brotherhood of Teamsters, etc., 2 Cir., 1963, 314 F.2d 53, 57–58; Warehouse and Mail Order Employees (Aetna Plywood), 140 N.L.R.B. 707, 709, 710; International Ladies' Garment Workers' Union (Coed Collar), 137 N.L.R.B. 1698, 1699; Local 239, Teamsters (Stan-Jay Auto Parts), 127 N.L.R.B. 958, 962, 969, affirmed National Labor Relations Board v. Local 239, International Brotherhood of Teamsters, etc., 2 Cir., 1961, 289 F.2d 41, 43–44, cert. den. 368 U.S. 833, 82 S.Ct. 58, 7 L.Ed.2d 35. Moreover, Local 1264's admitted object, "to encourage advertisers not to place their business with WALA-TV" is itself

proscribed by the first prohibition of Section 8(b) (4) (B) which makes it unlawful to "coerce * * * any person" with an object of "forcing * * * any person * * * to cease doing business with any other person."

We next turn to Local 1264's contention that its activities were protected by the second proviso to Section 8(b) (4). This proviso in relevant part provides:

That for the purposes of this paragraph (4) only, nothing contained in such paragraph shall be construed to prohibit publicity, other than picketing, *for the purpose of truthfully advising the public,* including consumers and members of a labor organization, that a product or products are produced by an employer with whom the labor organization has *a primary dispute* and are distributed by another employer * * * (Emphasis supplied.)

█ Local 1264 has the affirmative burden of establishing that its conduct comes within the proviso. Honolulu Typographical Union (Hawaii Press Newspapers, Inc.), 167 N.L.R.B. No. 150, 66 L.R.R.M. 1194; Centralia Building & Construction Trades Council (Pacific Sign & Steel Building Co., Inc.), 155 N.L.R.B. 803.

█ Roywood contends that the existence of a lawful primary labor dispute is a necessary element in the application of the second proviso to Section 8(b) (4). The court agrees.

█ "Primary dispute" as used in the second proviso to Section 8(b) (4) means "a bona fide labor dispute". National Labor Relations Board v. Northern California District Council of Hod Carriers, etc., 9 Cir., 1968, 389 F.2d 721, 725. Cf. National Labor Relations Board v. Denver Building and Construction Trades Council, 341 U.S. 675, 692, 71 S.Ct. 943, 95 L.Ed. 1284, 1297; Local 761, International Union of Electrical, Radio and Machine Workers, AFL–CIO v. National Labor Relations Board, 366 U.S. 667, 673, 81 S.Ct. 1285, 6 L.Ed.2d 592, 597; United Steelworkers of America, AFL–

CIO v. National Labor Relations Board, 376 U.S. 492, 496, 84 S.Ct. 899, 11 L.Ed. 2d 863, 866; National Woodwork Manufacturers Ass'n v. National Labor Relations Board, 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357, 368.

█ Section 8(b) (7) (B) of the National Labor Relations Act, 29 U.S. C.A. § 158(b) (7) (B), provides in part:

It shall be an unfair labor practice for a labor organization or its agents * * * to picket * * * any employer where an object thereof is forcing or requiring an employer to recognize or bargain with a labor organization as the representative of his employees * * * (B) where within the preceding twelve months a valid election under section 9(c) of this title has been conducted * * *

Section 8(b) (7) (B) was designed to protect "the employer and his employees from harassment where an election under NLRB provisions has resulted in a 'no union' certification." vol. II, Legis.Hist., LMRDA 1959, p. 1462(3), Retail Store Employees' Union, Local No. 692 (Irvins, Inc.), 134 N.L.R.B. 686, 690.

█ Local 1264 violated Section 8(b) (7) (B) of the Act when it continued to picket Roywood and Roywood's advertisers after the Board issued its "Certification of Results of Election" on July 2, 1967. It would be incongruous for Congress to prohibit direct activity against an employer because the object of the union's activity was proscribed and at the same time allow the union to bring economic pressure on uninterested secondary employers for the purpose of accomplishing the proscribed objective. Moreover, had Congress desired to allow a union to bring pressure on secondary employers to force another employer to recognize or bargain with a labor organization as a representative of its employees within twelve months after a valid election rejecting the union had been conducted under the Act, Congress could have done so by adding the second proviso to Section 8(b) (7) (C) to the proviso to Section

8(b) (4). The second proviso to Section 8(b) (7) (B) provides in part:

> * * * nothing in this subparagraph (C) shall be construed to prohibit any picketing or other publicity for the purpose of truthfully advising the public * * * that an employer does not employ members of, or have a contract with, a labor organization * * *

The court finds that Local 1264 did not have a "primary dispute" as the term is used within the second proviso to Section 8(b) (4) with Roywood on or after July 2, 1967, and, therefore, none of Local 1264's activity on or after July 2, 1967, is within nor protected by that proviso.

The court further finds that the advertiser picketing and the distribution of handbills in the immediate vicinity of an advertiser's place of business prior to the election was unprotected by the second proviso to Section 8(b) (4). Picketing is specifically excluded from the proviso. The important object of picketing is "keeping customers away from the employer's business." Lumber and Sawmill Workers Local Union No. 2797 (Stoltze Land & Lumber Company), 156 N.L.R.B. 388, 394. In *Stoltze*, the Board found that a union picketed by passing out handbills which were designed to keep "customers from dealing with the Company;" the *Stoltze* handbill did not contain a direct appeal to cease doing business with the company. Here, the handbill contained such a direct appeal. The distribution of handbills in the vicinity of an advertiser's place of business urging the public to refrain from doing business with the advertiser constitutes picketing within the meaning of the second proviso to Section 8(b) (4). Cf. National Labor Relations Board v. Local 182, International Brotherhood of Teamsters, etc., 2 Cir., 1963, 314 F.2d 53, 57–58. The rationale of National Labor Relations Board v. Fruit and Vegetable Packers and Warehousemen, Local 760, 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129, allowing peaceful consumer picketing at a secondary site, limited to persuading the public not to buy a primary employer's product, is not applicable where, as here, the primary employer's product is not readily identifiable, but has become part of the product or service of the secondary employer. Teamsters, Chauffeurs, Helpers and Taxicab Drivers, Local 327 (American Bread Company), 170 N.L.R.B. No. 19, 67 L.R.R.M. 1427, 1429–30.

The court is of the further opinion that Local 1264's practice, both before and after the election, of causing post cards to be mailed to Roywood's advertisers stating that a placard requesting union members or the public not to purchase the advertiser's product had been posted in a union hall outside of the broadcast area of WALA–TV is proscribed by Section 8(b) (4). The consideration of the wording of Section 8(b) (4) and the general objectives which Congress sought to achieve, convinces the court that Congress did not intend to allow a labor union to institute a nationwide boycott of an advertiser or an advertiser's product merely because the advertiser advertised over a broadcast station with whom a union had a dispute. Here, Local 1264 not only brought pressure on the entity that actually placed the advertising, but also on innocent distributors of the product who had nothing whatsoever to do with the placing of the advertising and apparently knew nothing of Roywood, Local 1264 or any bona fide or other dispute between Local 1264 and Roywood.

The court finds that Local 1264's use of placards and post cards originating within the broadcast area of WALA–TV prior to July 2, 1967, was protected by the second proviso to Section 8(b) (4) as these placards appear to be truthful and pertained to a bona fide labor dispute between Local 1264 and Roywood.

The court further finds that Local 1264's de-advertising campaign on and after July 2, 1967, was not protected by the second proviso to Section 8(b) (4) because Local 1264's communications were not truthful and "therefore not 'for the purpose of truthfully advising the

public' within the meaning of the proviso." Honolulu Typographical Union (Hawaii Press Newspapers, Inc.), 167 N. L.R.B. No. 150, 66 L.R.R.M. 1194, 1196–7. Local 1264 made no attempt to establish that "Roywood deliberately 'forced' its technicians out on strike." Indeed, the undisputed evidence in this record establishes that it was Local 1264, not Roywood, that terminated the pre-existing contract and that Local 1264 rejected Roywood's offer to extend the expiring contract "up to a period of two weeks" and, instead, struck without notice and without permission of its own International Union. Local 1264 made no effort to meet its affirmative burden of establishing that its assertion in the Mobile Dodge handbill that Roywood had engaged in "UNION BUSTING Tactics" was true. This record contains no evidence that Roywood engaged in any union busting tactic. Local 1264's alleged complaint is that WALA–TV is "Non-Union". The basis of Local 1264's complaint that WALA–TV is "Non-Union" is that the employees of Roywood voted against representation by Local 1264 in a government supervised election. Congress in its wisdom, gave employees the right to vote against representation by unions. Roywood is non-union because of the exercise of this right by its employees. Local 1264's communications accuse Roywood of engaging in "unfair competition". "The essence of unfair competition is fraud." Zangerle & Peterson Co. v. Venice Furniture Novelty Mfg. Co., 7 Cir., 1943, 133 F.2d 266, 269. Local 1264's plea "Please Help Us Maintain Union Working Conditions" displayed on its placards gives the false impression that wages and working conditions at Roywood were below the standards in union stations in the Mobile, Alabama, area. Local 1264 made no effort to ascertain the prevailing wages and working conditions at WALA–TV. Where, as here, the union has made no effort to ascertain the primary employer's wages and employment standards, the Board has consistently rejected the union's contention that the object of its activities was to maintain area standards established under union contracts. Centralia Building & Construction Trades Council (Pacific Sign & Steel Building Co., Inc.), 155 N.L.R.B. 803, 807, affirmed Centralia Building & Construction Trades Council v. National Labor Relations Board, 1966, 124 U.S.App.D.C. 212, 363 F.2d 699; Operating Engineers, Local 478 (Passarelli & Son, Inc.), 167 N.L.R.B. No. 53, 66 L.R.R.M. 1071, 1072; Millmen & Cabinet Makers Union (Steiner Lumber Company), 153 N.L.R.B. 1285, 1287.

In addition to the fact that Local 1264 made no effort to offer any evidence in support of its assertions of and concerning Roywood, the court finds that Local 1264's publicity was not "for the purpose of truthfully advising the public" because (a) Local 1264 did not give publicity to any other non-union broadcast station in the Mobile area, Lumber and Sawmill Workers Local Union No. 2797 (Stoltze Land & Lumber Company), 156 N.L.R.B. 388, 394; (b) Smith, Business Manager of Local 1264, testified that he didn't worry about whether Local 1264's communications were "true or false"; and, (c) Burns, Local 1264's President, admitted that Local 1264 "didn't say anything favorable towards the company as I know of" and that "it would have been favorable to the company to have told the truth." Cf. Linn v. United Plant Guard Workers of America, Local 114, 383 U.S. 53, 86 S.Ct. 657, 15 L.Ed.2d 582.

■ Local 1264's contentions that its de-advertising campaign was protected by Section 8(c) of the Act and by the First Amendment to the Constitution of the United States was decided adversely to Local 1264 by the United States Supreme Court in International Brotherhood of Electrical Workers, Local 501 v. National Labor Relations Board, 341 U. S. 694, 704–705, 71 S.Ct. 954, 95 L.Ed. 1299, 1307–1308, where the Court determined that a labor organization may not hide under the cloak of the United States Constitution or Section 8(c) of the Act where the labor organization used words

inoffensive in themselves to achieve an illegal objective, holding:

The remedial function of § 8(c) is to protect noncoercive speech by employer and labor organization alike in futherance of a *lawful* object. It serves that purpose adequately without extending its protection to *speech* or picketing in furtherance of unfair labor practices such as are defined in § 8(b) (4). The general terms of § 8(c) appropriately give way to the specific provisions of § 8(b) (4).

The prohibition of inducement or encouragement of secondary pressure by § 8(b) (4) (A) carries no unconstitutional abridgment of free speech. The inducement or encouragement in the instant case took the form of picketing followed by a telephone call emphasizing its purpose. The constitutionality of § 8(b) (4) (A) is here questioned only as to its possible relation to the freedom of speech guaranteed by the First Amendment. This provision has been sustained by several Courts of Appeals. The substantive evil condemned by Congress in § 8(b) (4) is the secondary boycott and we recently have recognized the constitutional right of states to proscribe picketing in furtherance of comparably unlawful objectives.

Damages suffered by Roywood as a result of the above described violations of Section 8(b) (4) will be determined in further proceedings not inconsistent with this opinion.

This opinion will serve as conclusions of law and findings of fact, pursuant to Rule 52 of the Federal Rules of Civil Procedure.